**UNITED STATES of America, Plaintiff-Appellee,**

v.

**ITT RAYONIER, INCORPORATED, Defendant-Appellant.**

No. 77–3672.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted June 5, 1980.

Decided Sept. 15, 1980.

Thomas H. Truitt, Washington, D. C., for defendant-appellant.

James Moore, Asst. U. S. Atty., Seattle, Wash., argued for plaintiff-appellee; John C. Merkel, U. S. Atty., Seattle, Wash., on brief.

Before WRIGHT, SKOPIL, and SCHROEDER, Circuit Judges.

EUGENE A. WRIGHT, Circuit Judge:

This case involves government delay in promulgating water pollution guidelines and industry delay in implementing pollution control technology. Each party asserts that its delay was justified and did not excuse the other's lack of diligence.

Specifically, the federal Environmental Protection Agency (EPA) and ITT Rayonier (Rayonier) dispute the meaning of a footnote attached to the discharge permit for Rayonier's pulp mill in Port Angeles, Washington, on the Straits of Juan de Fuca. Because this precise issue was previously litigated in state courts and determined favorably to Rayonier, we find the EPA collaterally estopped from asserting a contrary position in this enforcement action in federal court.

## BACKGROUND

In 1972 Congress established the National Pollutant Discharge Elimination System (NPDES) under § 402 of the Federal Water Pollution Control Act (FWPCA). 33 U.S.C. § 1342. Under this system state agencies, pursuant to an approved state program, may issue water pollution discharge permits. In November 1973, the EPA approved Washington's permit program and transferred permit-issuing authority to the Washington Department of Ecology (DOE). See 39 Fed.Reg. 26,061 (1974).

FWPCA authorized issuance of NPDES permits designed to achieve compliance by July 1, 1977, with regulations (effluent limitations) defining "best practicable control technology" (BPT). 33 U.S.C. § 1311(b)(1)(A).[1] The EPA was to establish

---

1. FWPCA's stated purpose is "to restore and maintain the chemical, physical and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a). To achieve that objective, Congress declared, "it is the national goal that the discharge of pollutants into the navigable waters be eliminated by 1985." Id.

FWPCA envisioned a two phase program: (1) achieve best practicable technology (BPT) by July 1, 1977; and (2) achieve best available technology (BAT) by July 1, 1983. The Clean Water Act of 1977, Pub.L. 95–217, changed the BAT requirement to a more flexible "best conventional technology" standard and extended the deadline to July 1, 1984.

The Clean Water Act also amended FWPCA to allow the EPA to grant BPT extensions up to April 1, 1979, for dischargers unable to meet the July 1, 1977, deadline despite good faith efforts. 33 U.S.C. § 1319(a)(5)(B). Rayonier indicated to the district court it could not achieve compliance before June 1979, thus could not qualify for this deadline extension.

Section 402 of FWPCA established NPDES permits as the primary means to enforce effluent limitations. All discharges must be authorized by a permit issued by the EPA or the authorized state agency. A permit transforms "generally applicable effluent limitations and other standards . . . into the obligations (including a time table for compliance) of the individual discharger." EPA v. Calif. ex rel. State Water Res. Bd., 426 U.S. 200, 205, 96 S.Ct. 2022, 2025, 48 L.Ed.2d 578 (1976).

BPT effluent limitations for the pulp industry by October 1973. 33 U.S.C. § 1314(b).

*RAYONIER'S PERMIT*

In the summer of 1973 and early in 1974, Rayonier and DOE negotiated the terms of an NPDES permit. Because the EPA had not yet established effluent limitations, the parties incorporated discharge limitations from prior legislation.[2] Contemplating imminent promulgation of guidelines, the parties included *footnote f* in that section of the permit containing numerical discharge standards for various pollutants:

> The biochemical oxygen demand, suspended solids, and pH limitations will be modified to be consistent with the applicable final effluent guidelines when promulgated by the EPA in the *Federal Register*, or as thereafter modified by final action consequent upon any appeal from such guidelines.

A separate section of the permit set forth the compliance schedule for attaining the permit standards. DOE issued the permit in August 1974 and the EPA did not exercise its veto authority. *See* 33 U.S.C. § 1342(d)(2).

Disputes arose as to the adequacy of Rayonier's implementation plans. In November 1975, the EPA advised DOE that, if it did not take action, Rayonier would be a "candidate" for federal enforcement. Doe issued a compliance order in December 1975 which Rayonier appealed to the state Pollution Control Hearings Board.

In February 1976, more than two years after its statutory deadline, the EPA promulgated effluent limitations for pulp mills.[3] Rayonier and other pulp firms immediately challenged those standards in federal court.[4] In its July 1976 hearing

before the state pollution control hearings board, Rayonier contended *footnote f* extended its compliance schedule pending final judicial approval of the EPA's proposed effluent guidelines. The board disagreed, denied a stay pending judicial review, and ordered Rayonier to meet its permit compliance schedule. This order was stayed pending Rayonier's appeal to state superior court.

In March 1977, the EPA issued a notice of violation to Rayonier and DOE pursuant to 33 U.S.C. § 1319(a)(1). Three weeks later the state court reversed the hearings board, finding *footnote f* excused compliance pending judicial approval of final effluent limitations. DOE appealed to the state supreme court, notifying the EPA that it was effectively prevented from further enforcement. In April 1977, the EPA filed its own enforcement action in federal court under 33 U.S.C. § 1319(b), seeking injunctive relief and civil penalties. The July 1, 1977, statutory deadline for attaining best practicable control technology passed with the parties at an impasse.

In October 1977, the district court granted the EPA's motion for summary judgment on the injunctive phase of the case and ordered immediate compliance with the permit. The court found *footnote f* to be an unambiguous declaration pertaining only to substitution of standards and not to modification of the compliance schedule.

Pending appeal of the district court's injunction order, several significant events have transpired. First, the D.C. Circuit upheld the BPT effluent limitations for the pulp industry with one relevant exception. *Weyerhaeuser Co. v. Costle*, 590 F.2d 1011 (D.C.Cir.1978).[5] Second, the Washington

---

2. The permit contained discharge limitations for suspended solids, pH and biochemical oxygen demand derived from § 13 of the Rivers and Harbors Act of 1899. 33 U.S.C. § 407.

3. These limitations were promulgated in "interim final form." Final limitations were not issued until January 6, 1977.

4. *Weyerhaeuser Co. v. Costle*, 590 F.2d 1011 (D.C.Cir.1978).

5. The D.C. Circuit upheld all BPT effluent limitations except biochemical oxygen demand (BOD) for grade dissolving sulfite mills, such as Rayonier's Port Angeles plant. *Weyerhaeuser v. Costle*, 590 F.2d 1011, 1028–31 (D.C.Cir. 1978). On March 12, 1980, the EPA proposed a modified BOD limitation. *See* 45 Fed.Reg. 15,-952–54 (1980) (to be codified in 40 C.F.R. § 430.112(g)). Comments were due by May 12, 1980. The proposed BOD guideline recalculat-

Supreme Court affirmed Rayonier's position in the state court suit. *ITT Rayonier, Inc. v. Department of Ecology*, 91 Wash.2d 682, 586 P.2d 1155, 593 P.2d 1308 (1978). The court examined the "logical application" of *footnote f* and found:

> The importance of final standards prior to [the expenditure of funds] establishes the natural interdependence of the standards . . . and the compliance schedule . . . .

91 Wash.2d at 690, 586 P.2d at 1160.

■ Finally, pursuant to the district court's compliance order, Rayonier has installed pollution control equipment provisionally satisfactory to the EPA. Despite Rayonier's compliance, the appeal is not moot because the district court has determined liability and retained jurisdiction to ascertain civil penalties under 33 U.S.C. § 1319(d). *See, e. g., Planned Parenthood of Minn., Inc. v. Citizens for Comm. Action*, 558 F.2d 861, 865 (8th Cir. 1977); *E. P. Hinkel & Co. v. Manhattan Co.*, 506 F.2d 201, 204 (D.C.Cir.1974). *Cf. Trans Intern. Airlines v. Intern. Brotherhood*, No. 77–3362 (9th Cir., February 14, 1980) (appeal of injunctive order not moot because resolution crucial to deciding pending damages claim).

As a threshold matter, Rayonier asserts the judgment in the state enforcement action operates to preclude the EPA's action. It also contends the EPA is barred from bringing the instant action under the doctrines of election of remedies and unclean hands. If these arguments are unavailing, Rayonier urges this court to construe *footnote f* as modifying its compliance schedule. Because we find the EPA collaterally estopped from disputing the meaning of *footnote f*, we need not address remaining issues.

*RES JUDICATA/COLLATERAL ESTOP-PEL*

The district court held, as a matter of law, no privity exists between DOE and EPA for enforcement purposes. For this proposition, the court relied exclusively upon 33 U.S.C. § 1342(i), which provides:

> Nothing in this section [pertaining to NPDES] shall be construed to limit the authority of the [EPA] Administrator to take [enforcement] action . . . . .

■ Under the doctrine of res judicata, "a final judgment on the merits bars further claims by parties or their privies based on the same cause of action." *Montana v. United States*, 440 U.S. 147, 153, 99 S.Ct. 970, 973, 59 L.Ed.2d 210 (1979). Under collateral estoppel principles, once an issue is actually litigated and necessarily determined, that determination is conclusive in subsequent suits based on a different cause of action but involving a party or privy to the prior litigation. *Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 326 n. 5, 99 S.Ct. 645, 649 n. 5, 58 L.Ed.2d 552 (1979). The purposes of these judicially created rules are to conserve judicial resources, protect litigants from multiple lawsuits, and foster certainty and reliance in legal relations. *See Montana v. United States*, 440 U.S. at 153–54, 99 S.Ct. at 973–974; *Hooker v. Klein*, 573 F.2d 1360, 1368 (9th Cir.), *cert. denied*, 439 U.S. 932, 99 S.Ct. 323, 58 L.Ed.2d 327 (1978).

■ In the absence of "countervailing statutory policy," collateral estoppel bars relitigation of factual questions or mixed questions of law and fact. *See Brown v. Felsen*, 442 U.S. 127, 139, n. 10, 99 S.Ct. 2205, 2213, n. 10, 60 L.Ed.2d 767 (1979). We look to the statutory language and history of FWPCA to determine if it creates a "special circumstance" warranting an exception to the normal rules of preclusion. *See Montana v. United States*, 440 U.S. at 155, 99 S.Ct. at 974–975.

### 1. *FWPCA and Collateral Estoppel*

Section 1342(i) preserves federal enforcement authority despite state permit-issuing power. It is included in that section of FWPCA implementing the NPDES permit program. The legislative history of

---

ed the secondary waste load in accordance with the *Weyerhaeuser* opinion. The revised guideline is slightly higher than the invalidated BOD guideline. (BOD is limited to 30.4 pounds per ton of production as opposed to 29.7 pounds.)

FWPCA is replete with references to "dual" or "concurrent" enforcement authority.[6] The act has been said to create a "delicate partnership" between state and federal agencies. *Save the Bay, Inc. v. EPA*, 556 F.2d 1282, 1284 (5th Cir. 1977).

The existence of concurrent enforcement powers does not per se negate the application of res judicata principles. *See Ma Chuck Moon v. Dulles*, 237 F.2d 241, 243 (9th Cir. 1956), *cert. denied*, 352 U.S. 1002, 77 S.Ct. 559, 1 L.Ed.2d 547 (1957).

Section 1342(i) reserves EPA's authority to bring an enforcement action notwithstanding an approved state permit system with concomitant enforcement powers. Enforcement actions could have been filed concurrently in both state and federal courts. *See* 33 U.S.C. § 1319(b) (federal); 33 U.S.C. § 1342(b)(7) (state). This does not necessarily preclude the operation of collateral estoppel after one action reaches finality.

Although no court has directly addressed the preclusive effect of prior judicial enforcement actions under FWPCA, courts in dicta have assumed the doctrine is not abrogated. *See, e. g., United States v. Pennsylvania Environ. Hrg. Bd.*, 584 F.2d 1273, 1276, n. 15 (3d Cir. 1978) (implying earlier state administrative determination under NPDES has res judicata effect in federal court action); *Reserve Mining v. EPA*, 514 F.2d 492, 534 (8th Cir. 1975), modified on other grounds, 529 F.2d 181 (8th Cir. 1976) (*non-final* decision in state enforcement action not a bar to federal action under FWPCA). *See also, Menzel v. County Utilities Corp.*, 14 Envir.Rep. (BNA) 1126 (E.D. Va.1979) (in citizen's suit under FWPCA district court accords full faith and credit to state court judgment construing permit). *Cf. Buckeye Power v. EPA*, 481 F.2d 162, 167, n. 2 (6th Cir. 1973) (dictum that court first acquiring jurisdiction, state or federal, under analogous Clean Air Act, has "exclusive jurisdiction" to proceed and its judgment will be res judicata).

Further, it has been suggested that enforcement agencies could invoke res judicata offensively against a second alleged polluter because of its privity relationship with a prior adjudged polluter. *See Reserve Mining v. EPA*, 514 F.2d at 533. Rayonier asserts the doctrine defensively to preclude successive prosecutions.

The real question in the context of this suit is the conflict between state and federal courts. Res judicata is a rule promoting harmony and cooperation between courts. *See United States v. Bank of New York Co.*, 296 U.S. 463, 477–78, 56 S.Ct. 343, 347–348, 80 L.Ed. 331 (1936).

We do not perceive how the need for uniformity under FWPCA is best promoted by conflicting judicial constructions and repeated agency prosecutions. To extend the Fifth Circuit's analogy in *Save the Bay v. EPA*, 556 F.2d at 1284, "the delicate partnership" would be strained by such an interpretation. Indeed, a judgment against one partner on a partnership obligation may be res judicata of the liability of another partner. *Cf. United States v. Webber*, 396 F.2d 381, 388 (3d Cir. 1968) (judgment against predecessor partnership binds individual partners).

In employment discrimination suits under Title VII of the 1964 Civil Rights Act, 42 U.S.C. § 2000e et seq., several circuits have refused to give collateral estoppel effect to prior decisions by state agencies under state law. *See, e. g., Batiste v. Furnco Constr. Corp.*, 503 F.2d 447, 450 (7th Cir. 1974), *cert. denied*, 420 U.S. 928, 95 S.Ct. 1127, 43 L.Ed.2d 399 (1975); *Cooper v. Philip Morris, Inc.*, 464 F.2d 9 (6th Cir. 1972); *Voutsis v. Union Carbide Corp.*, 452 F.2d 889, 894 (2nd Cir. 1971), *cert. denied*, 406 U.S. 918, 92 S.Ct. 1768, 32 L.Ed.2d 117 (1972). *See also, Gunther v. Iowa State Men's Reformatory*, 612 F.2d 1079 (8th Cir. 1980) (refusing to accord collateral estoppel effect to prior state court determination). *But see, Sinicropi v. Nassau County*, 601 F.2d 60 (2d

---

**6.** *See e. g.*, Sen.Rpt. No. 92–414, 92d Cong., 2d Sess., reprinted in [1972] U.S.Code Cong. & Admin.News, pp. 3668, 3675; *Id.* at 3730.

**1002**

Cir.), *cert. denied*, 444 U.S. 983, 100 S.Ct. 488, 62 L.Ed.2d 411 (1979) (Title VII suit barred when issues decided adversely to plaintiff in prior state proceeding).

These courts have found a countervailing public policy that a plaintiff is not to be deprived of a federal forum to adjudicate employment discrimination claims. Unlike Title VII, FWPCA does not provide a mandatory period of deference to state proceedings. *Compare* 42 U.S.C. § 2000e–5(c) *with* 33 U.S.C. § 1319(a).

FWPCA contemplates concurrent enforcement actions. 33 U.S.C. §§ 1319(b), 1342(b)(7). Only if the EPA decides to exercise its enforcement option of issuing a notice of violation to the state agency, rather than immediately prosecuting, is a waiting period prescribed. The state is given 30 days to commence "appropriate enforcement action." 33 U.S.C. § 1319(a)(1). Thereafter, FWPCA does not specifically mandate a *de novo* hearing in federal court. *Cf. Chandler v. Roudebush*, 425 U.S. 840, 844–45, 96 S.Ct. 1949, 1951–1952, 48 L.Ed.2d 416 (1976) (Title VII clearly provides for *de novo* hearings in federal court).

Unlike successive state and federal employment discrimination actions, state and federal enforcement actions under FWPCA are based on permits issued under a single system. The EPA retains authority to veto state-issued permits. 33 U.S.C. § 1342(d)(2). Further, it may revoke the permit issuing authority of the state agency. *See* 33 U.S.C. § 1342(c)(3). Although Title VII may manifest Congressional intent to permit pursuit of independent rights in successive state and federal actions, *Alexander v. Gardner-Denver Co.*, 415 U.S. 36, 47–49, 94 S.Ct. 1011, 1019–1020, 39 L.Ed.2d 147 (1974), FWPCA was designed to supplant rather than supplement previous water pollution control legislation. *See* Sen.Rpt. No. 92–414, 92d Cong., 2d Sess., *reprinted in* [1972] U.S.Code Cong. & Admin.News, pp. 3668, 3675.

Congress has stated FWPCA does not involve a "delegation" of federal authority. House Conf.Rpt. No. 95–830, 95th Cong., 1st Sess., *reprinted in* [1977] U.S.Code Cong. & Admin.News, pp. 4424, 4479. Although the NPDES state permit program is established under state law and functions "in lieu" of federal authority, the source of the federal/state "partnership" can be traced to a single act of Congress (FWPCA). Regardless whether the state's enforcement position can be accurately described as a "delegee" of powers, its authority *vis a vis* NPDES permits is derived from FWPCA and is revocable by the EPA.

■ For these reasons we do not believe FWPCA manifests countervailing policy reasons to abrogate the doctrine known generically as res judicata. If the EPA is dissatisfied with state enforcement efforts or the lack thereof it can revoke permit-issuing authority or bring an independent action in federal court. Where, as here, a state court has entered a final judgment on an identical issue, the EPA cannot invoke FWPCA to avoid any preclusive effect that judgment may have.

*2. Privity*

Having determined that FWPCA does not abrogate res judicata principles, we must ascertain if such principles are applicable here.[7] It is not disputed that the same operative facts gave rise to the two actions. *See Johnson v. Dept. of Water & Power of Los Angeles*, 450 F.2d 294 (9th Cir. 1971), *cert. denied*, 405 U.S. 1072, 92 S.Ct. 1525, 31 L.Ed.2d 806 (1972). Of the prerequisites for application of collateral estoppel, identity of the parties is the only challenged element. The EPA contends it was neither a party nor privy to the prior state court action.

---

7. Under 28 U.S.C. § 1738, Congress imposed an obligation on federal courts to give full faith and credit to judgments entered by state courts of competent jurisdiction. This ordinarily requires analysis of the res judicata effect of state court proceedings within the state. Our conclusion would be no different were we to apply the Washington law of res judicata under the full faith and credit statute. Traditional claim preclusion is applied in that jurisdiction. *Bordeaux v. Ingersoll Rand Co.*, 71 Wash.2d 392, 429 P.2d 207 (1967).

■ The doctrine of privity extends the conclusive effect of a judgment to nonparties who are in privity with parties to an earlier action. In *Chicago, R.I. & P. Ry. Co. v. Schendel*, 270 U.S. 611, 46 S.Ct. 420, 70 L.Ed. 757 (1926), the Supreme Court characterized the relationship as one of "substantial identity" between parties. 270 U.S. at 621, 46 S.Ct. at 424.

■ Courts are no longer bound by rigid definitions of parties or their privies for purposes of applying collateral estoppel or res judicata. *Jackson v. Hayakawa*, 605 F.2d 1121, 1126 (9th Cir. 1979), *cert. denied*, 445 U.S. 952, 100 S.Ct. 1601, 63 L.Ed.2d 787 (1980). One who is not a party of record may be bound if he had a sufficient interest and participated in the prior action. *Montana v. United States, supra.*

■ Further, "privy" may include those whose interests are represented by one with authority to do so. *See Ma Chuck Moon v. Dulles, supra.*

Courts have recognized that a non-party may be bound if a party is so closely aligned with its interests as to be its "virtual representative." *Aerojet Gen'l. Corp. v. Askew*, 511 F.2d 710, 719 (5th Cir.) (and cases cited), *cert. denied*, 423 U.S. 908, 96 S.Ct. 210, 46 L.Ed.2d 137 (1975). *See also* Restatement of Judgments § 83 (1942); 1B Moore's Federal Practice ¶ 0.411 (2d ed. 1965). This contemplates an express or implied legal relationship by which parties to the first suit are accountable to non-parties who file a subsequent suit with identical issues.

We find the contention of variance of parties in these enforcement actions to be insubstantial. The interests of DOE and the EPA were identical and their involvement sufficiently similar. *See Jackson v. Hayakawa*, 605 F.2d at 1126. They share more than an abstract interest in enforcement.

DOE issued its original enforcement order following the EPA's prompting that absent state action Rayonier was a candidate for federal enforcement. It is undisputed that DOE maintained the same position as the EPA before the state hearings board and state courts. *See ITT Rayonier, Inc. v. Department of Ecology*, 91 Wash.2d 682, 593 P.2d 1308 (1978). The EPA does not contend that DOE failed to assert vigorously its position in the state proceedings.

■ In some contexts, the relationship between governmental authorities as public enforcers of ordinances and private parties suing for enforcement as private attorneys general is close enough to preclude relitigation. *Southwest Airlines Co. v. Texas International Airlines, Inc.*, 546 F.2d 84, 98 (5th Cir. 1977), *cert. denied* 434 U.S. 832, 98 S.Ct. 117, 54 L.Ed.2d 93 (1977). The instant situation presents an analogous relationship. Both DOE and the EPA acted to enforce the same permit.

FWPCA vests authority in state agencies to administer the terms of the NPDES program; however, the allocation of authority between state and federal agencies under FWPCA is far from clear. *Shell Oil Co. v. Train*, 585 F.2d 408 (9th Cir. 1978). In a jurisdictional context this circuit has declared that nothing in FWPCA suggests an "agency relation" between EPA and the state such that the latter's action in issuing or denying a permit could be deemed the action of the EPA. *See Washington v. EPA*, 573 F.2d 583, 586 (9th Cir. 1978).[8] *See also Shell Oil v. Train, supra* (federal court without jurisdiction to hear challenge to state NPDES permit determination even where permitee alleges EPA is the "moving force" behind the state determination).

■ In the context of this case, however, we need not find a strict agency relationship. The relationship between DOE and the EPA, however, it may be labeled, is sufficiently "close" under the circumstances to preclude relitigation of the issue already resolved in state court.

---

**8.** *Washington v. EPA* was overruled insofar as it held that the EPA's veto of a state-issued permit did not give the courts of appeals direct review authority under 33 U.S.C. § 1369. *Crown Simpson Pulp Co. v. Costle*, 445 U.S. 193, 100 S.Ct. 1093, 63 L.Ed.2d 312 (1980).

As the permit in question has expired,[9] and the relevant effluent regulations have either received judicial approval or are in the process of completion,[10] this suit may be *sui generis.* The propriety of the state court's construction of *footnote f* is not before this court. The doctrine of res judicata does not depend on whether the prior judgment was free of error. *Milliken v. Meyer,* 311 U.S. 457, 462, 61 S.Ct. 339, 342, 85 L.Ed. 278 (1940). If it did, judgments would lack finality, the very rationale of the rule of res judicata.

The district court judgment is RE-VERSED.

9. Under FWPCA, permits may be issued for a maximum 5 year period. 33 U.S.C. § 1342(b)(1)(B). This court was informed at oral argument that the permit at issue expired on August 29, 1979. The EPA has vetoed DOE's proposed new permit for Rayonier for failure to incorporate more stringent BOD standards. Apparently, the EPA is considering issuance of a permit pursuant to its authority under 33 U.S.C. § 1342(d)(4).

10. *See* note 5, *supra.*