**HORIZON COAL CORPORATION,**
Plaintiff,

v.

**UNITED STATES of America,**
**et al., Defendants.**

**No. 5:92 CV 1327.**

United States District Court,
N.D. Ohio,
Eastern Division.

April 30, 1993.

J. Douglas Drushal, Bonnie C. Drushal, Critchfield, Critchfield & Johnston, Wooster, OH, for Horizon Coal Corp.

James L. Bickett, Office of the U.S. Atty., Akron, OH, Sandra E. Wartell, Office of the Sol., U.S. Dept. of the Interior, Pittsburgh, PA, for U.S.

Elizabeth A. Raies, Lee E. Plakas, David L. Dingwell, Tzangas, Plakas & Mannos, Canton, OH, for Jerry Kohl.

## MEMORANDUM OPINION AND ORDER

DOWD, District Judge.

Each of the parties in the above-captioned case has filed its own motion for summary judgment as listed below:

1. Motion of defendant United States of America (Docket ## 29–31); plaintiff's brief in opposition (Docket # 40); reply brief (Docket # 44);

2. Motion of plaintiff Horizon Coal Corporation (Docket # 32); both defendants' briefs in opposition (Docket ## 36, 39); reply brief (Docket # 43);

3. Motion of defendant Jerry Kohl, dba Kohl Industries (Docket # 34)[1] and plaintiff's brief in opposition (Docket # 41); and,

---

1. This motion seeks summary judgment not only on plaintiff's claims against this defendant, but also on this defendant's separate counterclaim against plaintiff.

4. Motion of plaintiff as to Kohl's counterclaim (Docket # 52) and Kohl's brief in opposition (Docket # 53).

On April 6, 1993, the Court heard oral arguments on the motions. Thereafter, on April 19, 1993, the parties submitted undisputed fact stipulations (Docket # 56). The issues are now ripe for determination.

## I. BACKGROUND

A mining site known as the Black Hawk Mine is located on two adjoining parcels of land in Stark County, Ohio. Defendant Jerry Kohl dba Kohl Industries ("Kohl") held title to one parcel containing about 400 acres. Kohl leased the mineral rights to the other parcel containing about 350 acres from the owner of that parcel, Philip Lattavo.[2] On August 20, 1980, Kohl obtained an industrial minerals permit ("permit IM–0750") for the entire site. (Joint Stipulation ["Joint Stip."], ¶¶ 1–5).

On August 26, 1980, Kohl and plaintiff Horizon Coal Corporation ("Horizon") signed a Contract Mining Agreement ("the mining agreement").[3] (Joint Stip., ¶ 6). Section 3(c) of the mining agreement provided that Kohl would be "solely responsible for the mining of all minerals except coal" and that Horizon would "be solely responsible for the mining of the coal." (Joint Stip., ¶ 7). Section 3(e) provided that Kohl would be responsible for compliance with "the tonnage requirements of the permit ... or for converting to strip mining permit if required by the regulatory agency." Section 5 provided that "Horizon will pay all taxes and fees for its machinery and operations."[4] The enforceability of this mining agreement is not at issue here.

Under permit IM–0750, Horizon mined coal at the Black Hawk mine site from 1980 through 1985. Under the same permit, and at the same time, Kohl mined other minerals at the site, specifically clay, limestone, sandstone, and shale. (Joint Stip., ¶ 8).

On November 4, 1982, Land Planning Associates, Inc. was formed for the purpose of obtaining permits to construct a sanitary landfill on the property. Kohl and Philip Lattavo were shareholders of the company. On March 14, 1983, Land Planning Associates, Inc. asked the Ohio EPA to approve the proposed site as a sanitary landfill. The company also applied for permits and sought approvals from all appropriate local and state authorities. (Joint Stip., ¶ 9).

On December 16, 1986, Kohl and Lattavo sold their properties to Green Basin Coal, Inc. which also agreed to purchase one hundred percent of the stock of Land Planning Associates, Inc. On February 9, 1987 Green Basin Coals, Inc. sold the parcels and the stock to Envirosure Management Corp. for use as a sanitary landfill. Kohl, however, maintained his right to mine the property. (Joint Stip., ¶ 13).

In 1987, the Ohio EPA issued a draft permit to install and the final permit was issued in 1989. Mining by Kohl Industries ceased in December of 1989 when Kohl's mining rights were purchased by Waste Management of Ohio, Inc., a successor in interest to Envirosure Management Corp. (Joint Stip., ¶ 14).

Between 1980 and 1985, the Ohio Department of Natural Resources ("ODNR"), operating under Ohio Revised Code Chapters 1513–1514, a state program approved by the United States Department of the Interior pursuant to the provisions of the Surface Mining Control and Reclamation Act of 1977, 30 U.S.C. § 1201, et seq. ("the SMCRA"), conducted frequent inspections and monitored operations at Black Hawk Mine.

Sometime after 1985, the ODNR raised the issue of compliance with respect to the requirement that coal production of parties holding industrial minerals permits may not exceed 16⅔ percent of all minerals mined at the site ("the ⅙ requirement").[5]

---

**2.** Mr. Lattavo is not a party to this action.

**3.** A copy of the mining agreement is attached as Exhibit A to Kohl's motion for summary judgment (Docket # 34).

**4.** There are several other provisions in the mining agreement; however, they are not relevant to the disposition of the motions for summary judgment.

**5.** Simply put, to continue operating under an industrial minerals permit, five (5) units of other

On April 4, 1988 the ODNR conducted a show cause hearing on the matter and, on September 20, 1989, issued its final decision that permit IM–0750 was in compliance with the ⅙ requirement. The significance of that decision was that reclamation taxes and/or fees were not assessed against the permit. Thus, permit IM–0750 maintained its status as an industrial minerals permit during the entire time the mining agreement was in effect.

Subsequently, the United States Department of the Interior Office of Surface Mining ("OSM") conducted a reclamation fee compliance audit of Horizon finding on November 30, 1990 that Horizon failed to report 165,-200.12 tons of coal mined under permit IM–0750, amounting to $57,820.04 in reclamation fees.[6] This covered the second, third, and fourth quarters of 1983, all of 1984, and the first quarter of 1985.

By letter dated December 12, 1990, Horizon sought an appeal and administrative review of the ·compliance audit results. Horizon argued that it was not an "operator" within the meaning of the law. In addition, it argued that the mining operations at Black Hawk Mine were not subject to reclamation fees because the coal produced met the ⅙ requirement and, further, if the requirement was not met, the responsibility was Kohl's.

On April 10, 1991, the OSM issued· its decision that Horizon was an "operator" and that, since the mine failed to meet the ⅙ requirement, Horizon was liable for the reclamation fees plus an additional $36,301.39 in interest, for a total of $94,121.43.

On June 13, 1991, the OSM wrote to Horizon and indicated that if the reclamation fees and interest were not paid in full forthwith the OSM would, among other things, suspend the present permit and deny future permits. On September 20, 1991, Horizon paid $97,-324.23, representing the then due balance according to OSM's calculations.

On April 15, 1992, Horizon filed an application for refund, which was denied by letter dated June 2, 1992. On June 30, 1992, this lawsuit was filed. Horizon seeks a complete

refund of the $97,324.23, with interest, from the United States or, failing that, a judgment in that amount against Kohl for breach of the provision in the mining agreement that Kohl was to maintain the ⅙ requirement which would free the mining operation from any reclamation fees.

## II. SUMMARY JUDGMENT STANDARD

It is well established that when considering a motion for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure, "the. inferences to be drawn from the underlying facts contained in [affidavits, pleadings, depositions, answers to interrogatories, and admissions] must be viewed in the light most favorable to the party opposing the motion." *U.S. v. Diebold*, 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962); *U.S. v. Hodges X–Ray, Inc.*, 759 F.2d 557 (6th Cir.1985); *Tee–Pak, Inc. v. St. Regis Paper Co.*, 491 F.2d 1193 (6th Cir.1974); *Bohn Aluminum & Brass Corp. v. Storm King Corp.*, 303 F.2d 425 (6th Cir.1962). However, the non-moving party bears the responsibility to demonstrate that summary judgment is inappropriate under Rule 56(e). The "adverse party may not rest upon the mere allegations or denials of [his] pleadings, but [his] response, by affidavits or otherwise ..., must set forth specific facts showing there is a genuine issue for trial. If [he] does not so respond, summary judgment, if appropriate, shall be entered against [him]." Fed.R.Civ.P. 56(e).

A court may grant summary judgment only if there are no issues of material fact in dispute and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). "[T]he judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). "[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party·for a jury to return a verdict for that

minerals had to be produced for every one (1) unit of coal. *See,* O.R.C. § 1514.01(A).

**6.** Fees are assessed at $0.35 per ton of coal.

party." *Id.* (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970); *First National Bank of Arizona v. Cities Service Co.*, 391 U.S. 253, 288–89, 88 S.Ct. 1575, 1592–93, 20 L.Ed.2d 569 (1968)). Therefore, "[i]f the evidence is merely colorable, . . ., or is not significantly probative, summary judgment may be granted." *Id.*, 477 U.S. at 249–50, 106 S.Ct. at 2511 (citing *Dombrowski v. Eastland*, 387 U.S. 82, 87 S.Ct. 1425, 18 L.Ed.2d 577 (1967) (per curiam); *First National Bank of Arizona v. Cities Service Co.*, 391 U.S. at 290, 88 S.Ct. at 1593)). " 'The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff.' " *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1477 (6th Cir.1989) (quoting *Anderson v. Liberty Lobby*, 477 U.S. at 252, 106 S.Ct. at 2512). Moreover, summary judgment is appropriate when the non-moving party "has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986).

In sum, "[t]he inquiry performed is the threshold inquiry of determining whether there is the need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby*, 477 U.S. at 250, 106 S.Ct. at 2511.

## III. DISCUSSION

### A. Plaintiff's Claims and the Parties' Motions

The primary issue in plaintiff's case is whether OSM properly assessed close to $100,000 in reclamation fees and interest against Horizon for its Black Hawk coal mining operation conducted under permit IM–0750.[7] All of plaintiff's claims will be disposed of by a finding that the assessment was improper. If, however, this Court finds that the assessment was proper, then it must decide whether Kohl is liable to Horizon for any or all of the amount which Horizon has already paid.

### 1. The Parties' Positions

The United States, in its motion for summary judgment and in its response to Horizon's motion for summary judgment, spends considerable time arguing that Horizon was an "operator" under SMCRA and that the mining operation was not entitled to exemption from the reclamation fees because it did not meet the ⅙ requirement. The United States holds this view notwithstanding the fact that ODNR found that the ⅙ requirement *was* met.

The United States asserts that 30 U.S.C. § 1253(a) provides that states with approved state programs have exclusive jurisdiction over the regulation of surface coal mining and reclamation operations, *except* for provisions in sections 1271 and 1273 and all of Subchapter IV, the subchapter which contains the provision governing reclamation fees for abandoned mines. Therefore, it is the position of the United States that the finding of the ODNR is irrelevant.

Plaintiff, in turn, argues that Subchapter IV has its own provision (30 U.S.C. § 1235) specifically granting jurisdiction to states with approved programs. It is plaintiff's position that the finding of the ODNR results in a res judicata effect and that the government is collaterally estopped from redetermining liability for reclamation fees based on the ⅙ requirement. In the alternative, plaintiff argues that the finding of ODNR is at least entitled to strong deference.

Defendant Kohl does not disagree with Horizon on this issue. Kohl asserts that it relied on the finding of the ODNR and that the United States is collaterally estopped from re-litigating an issue which has already been decided by the ODNR under the authority of the state program approved by the Department of the Interior.

---

7. Horizon brought this action for a refund. However, at the hearing, Horizon pointed out that conceptually it is in the position of a defendant from whom the government seeks to collect reclamation fees.

### 2. Analysis

█ The United States is correct in its position that Section 1253 provides that states with approved programs do not have exclusive jurisdiction over the determination and assessment of reclamation fees and the necessarily related issue of whether a mining operation meets the ⅕ requirement.

Conversely, Horizon is not correct that Section 1235 grants exclusive jurisdiction to the states on the same issue. In fact, Section 1235 expressly provides that Section 1232 (Reclamation Fees) is an exception to the exclusive responsibility and implementation authority which otherwise resides in states with approved programs.

However, this Court finds that both parties have failed to raise a very important distinction. Although these sections provide that states with approved programs do not have exclusive jurisdiction over certain matters, the sections do not provide that exclusive jurisdiction, therefore, resides in the United States. Rather, the non-exclusivity references in Sections 1235 and 1253 merely refer to the fact that either the relevant state agency *or* the OSM may enforce the provisions regarding, for example, reclamation fees.

█ Although the United States was free to institute enforcement proceedings, it did not do so *prior to* the same proceedings being instituted by the State of Ohio. When the State of Ohio made its determination, under the authority of its approved state program, that the Black Hawk mining operation under permit IM–0750 met the ⅕ requirement and that Kohl (and by extension Horizon) owed no reclamation fees, it settled the question as to the calendar quarters at issue in the instant lawsuit. That issue was improperly revisited by the OSM in its audit of Horizon.

In a somewhat similar case, the Ninth Circuit held that where a precise issue had been previously litigated in state court and determined favorably to the · defendant, the plaintiff Environmental Protection Agency ("EPA") was collaterally estopped from asserting a contrary position in an enforcement action brought in federal court. *United States v. ITT Rayonier, Inc.,* 627 F.2d 996 (9th Cir.1980).

*Rayonier* dealt with proceedings under the Federal Water Pollution Control Act ("FWPCA"), 33 U.S.C. § 1342. The FWPCA provided that state agencies, pursuant to federally approved state programs, could issue particular permits. The relevant state agency issued a permit to Rayonier and the EPA did not exercise its veto authority. Thereafter, disputes arose as to the adequacy of Rayonier's implementation plans. As permitted by the FWPCA, the EPA notified the state agency that if it did not take action, Rayonier would be a candidate for federal enforcement under the statute, which permitted the EPA to step in if the state was failing in its enforcement responsibility. The state agency issued a compliance order which Rayonier appealed to the relevant state hearings board. The hearings board found against Rayonier; however, that decision was reversed upon appeal to the state superior court. Thereafter, the EPA filed a separate enforcement action in federal court. The district court granted the EPA's motion for summary judgment. However, on appeal, the Ninth Circuit reversed, finding that the EPA was collaterally estopped from relitigating the issue which had already been decided by the state court.

The *Rayonier* court held that "[i]n the absence of 'countervailing statutory policy,' collateral estoppel bars relitigation of factual questions or ·mixed questions of law and fact." *Rayonier,* 627 F.2d at 1000. The court further stated that "the existence of concurrent enforcement powers does not per se negate the application of res judicata principles," nor does it "necessarily preclude the operation of collateral estoppel after one action reaches finality." *Id.* at 1001.

The *Rayonier* court also cited *United States v. Pennsylvania Environmental Hearing Board,* 584 F.2d 1273, 1276, n. 15 (3d Cir.1978) which implied that a prior state administrative (as opposed to judicial) determination had a res judicata effect in federal court, and *Buckeye Power v. EPA,* 481 F.2d 162, 167, n. 2 (6th Cir.1973) which, in dictum, stated that the court which first acquired jurisdiction under the Clean Air Act had

exclusive jurisdiction to proceed and that its judgment would be res judicata. *See also, Painters District Council No. 38 v. Edgewood Contracting Co.,* 416 F.2d 1081 (5th Cir.1969) (findings of the National Labor Relations Board given res judicata effect on the issue of liability); *Bernos Coal Co. v. Lujan,* 739 F.Supp. 1133 (E.D.Tenn.1989) (determination of the Tennessee Board of Reclamation Review that a mining site had been fully reclaimed was res judicata on the issue of whether the site contained slope violations).

This Court finds compelling the reasoning in *Edgewood Contracting, supra.* There, the Fifth Circuit affirmed the district court's ruling that collateral estoppel applied where the appellant "had been given a full hearing with ample opportunity, fully utilized, to develop its position, and that the Board's finding had been made while acting in a judicial capacity and was supported by substantial evidence." *Edgewood Contracting,* 416 F.2d at 1083.

It would be against public policy to promulgate a law whereby states can apply for and receive authorization from the United States to aid in the implementation and enforcement of that law if subsequent decisions issued under the authority of just such an approved state program are not to be considered binding upon the United States. Parties should be able to rely upon decisions made by the duly authorized state agency, without having to worry that the United States may, at any time,[8] assess fees, interest, and penalties inconsistent with the state's decision.

In the instant case, the ODNR conducted several hearings, including an evidentiary hearing, which resulted in a determination that the mining operation under permit IM–

0750 met the ⅙ requirement and was not liable for reclamation fees.[9] The United States is collaterally estopped from re-determining this issue, particularly where its determination is exactly the opposite of that reached by the state agency.[10] *See, Parklane Hosiery Co. v. Shore,* 439 U.S. 322, 326, 99 S.Ct. 645, 649, 58 L.Ed.2d 552 (1979).[11]

If the United States is dissatisfied with the way the State of Ohio is administering and/or enforcing its previously authorized program, the United States can withdraw its approval of that program and/or administer the provisions of the SMCRA itself. *See,* 30 U.S.C. § 1271(a)(1), (b). Until it does so, parties are entitled to rely on determinations made by the state agency without having to worry that the United States will "second guess" those decisions.

■ Even if this Court did not find the determination of the ODNR that the mining operations of Kohl met the ⅙ requirement to be preclusive on the issue, Horizon would nonetheless prevail on the merits.

All parties are in agreement that, under 30 U.S.C. § 1232(a), "operators of coal mining operations" are required to pay a reclamation fee of $0.35 for each ton of coal produced by "surface coal mining." The term "surface coal mining" excludes "the extraction of coal incidental to the extraction of other minerals where coal does not exceed 16% per centum of the tonnage of minerals removed for purposes of commercial use or sale." 30 U.S.C. § 1291(28)(A).

A critical issue in the determination of whether the ⅙ requirement was met is the characterization of Kohl's excavation of the mineral shale. All parties agree that if the

8. The United States asserts that there is no statute of limitations imposed upon its right to levy reclamation fees.

9. Although Horizon was not a party to the state administrative proceedings, the Court finds that there was privity between Horizon, as the actual coal mining entity, and Kohl, who held the mining permit and was a party to the proceedings.

10. The Court also notes that, although the United States was not a party to the state administrative proceedings, it was in privity with the ODNR which was entrusted with the enforcement of the

SMCRA pursuant to a federally-approved state program.

11. The *Parklane* Court set forth the four elements necessary to establish collateral estoppel: 1) the party against whom estoppel is sought was a party or in privity with a party in the prior action; 2) there was a final judgment on the merits after a full and fair opportunity to litigate the issue; 3) the issue was either admitted or actually tried and decided and was necessary to the final judgment; and, 4) the issue in the prior suit is identical to the issue sought to be estopped.

mining of shale was for a "commercial use or sale," then the tonnage of shale must be included when calculating the ⅙ requirement and no reclamation fees would be due. Everyone also agrees that if the tonnage of shale cannot be included, the ⅙ requirement is not met and the reclamation fees would be owed.[12] Therefore, the Court must determine whether Kohl's mining of shale was "commercial" within the meaning of the statute.[13]

Horizon asserts that the primary purpose of the Black Hawk mine was the extraction of clay, shale and other minerals so as to improve the site for use as a landfill. These non-coal minerals were extracted to permit Horizon to mine the coal. Thereafter, although some of the non-coal minerals were sold, most were put back, stockpiled, or otherwise used at the site for commercial improvements in preparation for sale of the property as a sanitary landfill.

The United States argues that the shale extracted on the property was simply used as fill dirt, as shown by the fact that it was on the property when the excavation began and, except for a small percentage, remained there throughout the operation. The United States characterizes the use of the shale as "landscaping to prepare the site for construction." (Docket # 39, at 2). As such, argues the United States, it constituted "fill" which is expressly excluded from the meaning of "other minerals" as used in 30 U.S.C. § 1291(28)(A).[14]

The Court finds that Horizon has the better argument. The parties have stipulated to the following facts:

1) Kohl, dba Kohl Industries, entered into a surface mining lease with Lattavo on April 14, 1980. (Joint Stip., ¶ 4).

2) Kohl received an industrial minerals permit on August 20, 1980. (Joint Stip., ¶ 5).

3) Kohl and Horizon entered into a contract mining agreement on August 26, 1980 permitting Horizon to mine coal while Kohl mined other minerals. (Joint Stip., ¶¶ 6–7).

4) On November 4, 1982, Kohl and Lattavo formed Land Planning Associates, Inc., to obtain permits to construct a sanitary landfill on the property. (Joint Stip., ¶ 9).

---

12. In that case, Horizon argues that it is not liable for the reclamation fees because it is not an "operator" within the meaning of the statute. Horizon further argues that Kohl should reimburse the fees which Horizon was already forced to pay because, under the mining agreement, Kohl was required to keep his mining of other minerals in proper proportion to Horizon's mining of coal so as to completely avoid any reclamation fees. Horizon provided Kohl with monthly reports of the amounts of coal being mined.

13. The parties have stipulated to the amounts of minerals that were mined during the relevant period as follows:

In 1983, 1,058,464 tons of mineral were extracted, including 172,838 tons of coal (16.33% of the total), 603,000 tons of shale (56.97%), 183,000 tons of limestone (17.29%), 36,626 tons of clay (3.08%), and 67,000 tons of sandstone (6.33%).

In 1984, 1,237,143 tons of mineral were extracted, including 204,922 tons of coal (16.56% of the total), 515,000 tons on shale (41.63%), 116,866 tons of limestone (9.45%), 313,355 tons of clay (25.33%), and 87,000 tons of sandstone (7.03%).

In 1985, 396,127 tons of mineral were extracted, including 34,531 tons of coal (8.72% of the total), 143,000 tons of shale (36.10%), 31,451 tons of limestone (7.94%), 149,145 tons of clay (37.65%), and 38,000 tons of sandstone (9.59%).

14. The United States refers to comments in the Federal Register which state that:

Including fill material as an "other mineral," or including fill as a valid commercial use of an "other mineral," could result in the inappropriate claiming of an exemption. For example, a person claiming the exemption could haul "overburden" to a site outside the mining area and claim the material is being commercially placed to prepare a site for construction, farming, etc. Allowing such claims could circumvent the provisions of the Act.

54 Fed.Reg. 52096 (December 20, 1990).

Horizon argues that this regulation was not in effect during the period in question and that, even if it were, it would not apply because it refers not to shale but to fill material and overburden, i.e. topsoil. Horizon further argues that even if the regulation applied to shale, it merely prohibits the stockpiling of waste so as to avoid the one-sixth requirement, not the purposeful stockpiling of commercially viable minerals as in this case.

5) On March 14, 1983, Land Planning Associates, Inc. asked the Ohio EPA to approve the proposed site as a sanitary landfill. The company also began the process of obtaining permits and approvals from state and local authorities. (Joint Stip., ¶ 9).

It is apparent from this chronology, and supported by Kohl's deposition testimony (*See,* Kohl Depo. at 17–18, 20–22, 26–27, 28), that from the onset Kohl's purpose was to improve the property's resale value by preparing it for use as a sanitary landfill. Kohl simply made *commercial use* of his own products for the improvements rather than buying products from a third party. Kohl clearly saw this as a money-making venture.[15] Horizon's mining operation was strictly intended to remove the coal so that the remaining minerals could be used to reclaim the property and to prepare it for landfill use.

This is precisely what happened. On December 16, 1986, Kohl and Lattavo sold the properties (improved for landfill use) to Green Basin Coal, Inc. They also sold to Green Basin one hundred percent of the stock of Land Planning Associates, Inc. On February 9, 1987, Green Basin Coal, Inc. sold the properties and the stock to Envirosure Management Corp. for use as a sanitary landfill. (Joint Stip., ¶ 13). (Copies of the relevant agreements have been filed under seal.) The Ohio EPA issued a draft permit to install in 1987 and the final permit in 1989. Mining by Kohl Industries ceased in December of 1989 when Kohl's mining rights were purchased by Waste Management of Ohio, Inc., a successor in interest to Envirosure Management Corp. (Joint Stip., ¶ 14).

Accordingly, when looking at the facts as a whole, this Court finds that the $97,324.23 in reclamation fees and interest was improperly assessed by the United States. Horizon is entitled to a refund of this amount, plus interest. Therefore, as regards plaintiff's motion (Docket # 32): summary judgment is granted for plaintiff against defendant United States on Count I of the complaint. This judgment renders moot Count II against defendant Kohl, as well as those portions of Kohl's motion for summary judgment dealing with issues raised by plaintiff's complaint (Docket # 34, Sections II, A and B). In addition, the motion for summary judgment of the United States (Docket # 29) is necessarily denied.

## B. Defendant Kohl's Counterclaim

■ Defendant Kohl was granted leave to file a counterclaim against Horizon seeking reimbursement for severance taxes in the amount of $21,706.97 which Kohl alleges it paid despite the fact that Horizon was responsible for all taxes under the mining agreement. Kohl seeks summary judgment on this counterclaim (Docket # 34, Section II, C).

Kohl filed its motion for leave to file a counterclaim on the same day it filed its motion for summary judgment. When Horizon filed its response to the motion for summary judgment on December 23, 1992, it had not yet received the Court's ruling on Kohl's counterclaim motion, issued on December 22, 1992. In its response, Horizon expressly reserved, until such time as the motion for leave to file a counterclaim was ruled upon, its right to respond to the motion for summary judgment as it relates to any such counterclaim.

Subsequently, Kohl's counterclaim was filed on December 30, 1992. Horizon's answer was filed on January 13, 1993. On February 26, 1993, Horizon filed its own motion for summary judgment on Kohl's counterclaim along with its response to Kohl's motion for summary judgment on the counterclaim.

Horizon denies liability to Kohl for severance taxes on two grounds: 1) that the counterclaim is barred by defendant Kohl's having previously executed a complete and general release of any and all claims against plaintiff; and, 2) that the counterclaim is barred by res judicata, the matters set forth therein having been the subject of litigation

---

**15.** Documents filed under seal show that the property sold for a considerable amount of money after it had been improved.

between Kohl and plaintiff in the Stark County Court of Common Pleas, Case No. 85–1492. Horizon also asserts that Kohl cannot prevail on the merits of his counterclaim and that the counterclaim was filed in violation of Rule 11.

Horizon's counsel has submitted an affidavit wherein he states that he represented Horizon in the previous state court action brought by Kohl against Horizon and that at no time in that previous litigation, which covered the same Contract Mining Agreement at issue here, did Kohl raise the issue of severance taxes. A copy of a General Release signed by Kohl on March 11, 1988 is attached to the affidavit.

Having examined the provisions of the General Release, this Court finds that Horizon's position is well-taken that the General Release operates as an accord and satisfaction barring Kohl's counterclaim.

Accordingly, Kohl's motion for summary judgment, as it relates to his counterclaim (Docket # 34, Section II, C), is denied.

### IV. CONCLUSION

For the reasons set forth above, plaintiff's motion for summary judgment (Docket # 32) is granted as to defendant United States of America. As to defendant Kohl, the motion is denied as moot.

The motion for summary judgment of defendant United States (Docket # 29) is denied.

The motion for summary judgment of defendant Kohl (Docket # 34) is rendered moot as regards the issues raised in Section II, A and B; the motion is denied as regards the counterclaim issue raised in Section II, C.

Plaintiff's motion for summary judgment on Kohl's counterclaim (Docket # 52) is granted.

Judgment will be entered forthwith in favor of Horizon on Kohl's counterclaim, with each party to bear its own costs.

However, the Court will delay entering judgment for Horizon against the United States until these two parties first have an opportunity to determine, mutually, if possi-

ble, the precise amount of interest due on the $97,324.23.

The parties are directed to submit a joint proposal for a Judgment Entry by May 17, 1993. If the parties are unable to agree upon a joint proposal, they shall separately file by that date briefs supporting their individual positions as to the amount of interest due to Horizon. The briefs should not exceed five (5) pages, exclusive of exhibits.

IT IS SO ORDERED.