**HARMON INDUSTRIES, INC., Plaintiff,**

v.

**Carol M. BROWNER, et al., Defendants.**

No. 97–0832–CV–W–3.

United States District Court,
W.D. Missouri,
Western Division.

Aug. 25, 1998.

Terry J. Satterlee, Susan M. Honegger, Alok Ahuja, Lathrop & Gage L.C., Kansas City, MO, for Plaintiff.

James C. Bohling, U.S. Attorney's Office, Kansas City, MO, Eric G. Hostetler, U.S. Dept. of Justice, Washington, DC, for Defendants.

### ORDER REVERSING THE FINAL DECISION OF THE ENVIRONMENTAL APPEALS BOARD

SMITH, District Judge.

Pending are the parties' cross-motions for summary judgment (Doc. # 27 & 33). Oral argument on the parties' cross-motions for summary judgment was held on Wednesday, June 17, 1998. For the reasons set forth in this Order, after consideration of the arguments, the parties' briefs and the administrative record, Plaintiff's Motion is granted in part and denied in part and Defendants' Motion is granted in part and denied in part.[1]

### I. BACKGROUND

The Plaintiff, Harmon Industries, Inc. ("Harmon"), filed this action to obtain review of a final order of the Environmental Protection Agency ("EPA") assessing a civil penalty of $586,716 against Harmon under the Resource Conservation and Recovery Act ("RCRA"). The EPA contends that from 1973 to 1987, Harmon's employees disposed of thousands of gallons of hazardous solvents at its Grain Valley, Missouri manufacturing facility.[2] In approximately November of 1987, Harmon's management discovered the disposal practice, halted it and conducted a Phase I investigation. In June 1988, the discontinued disposal practice was reported to the Missouri Department of Natural Resources ("MDNR"). MDNR conducted its own investigation and clean up ensued. On September 30, 1991, EPA filed an administrative complaint, compliance order and notice of opportunity for hearing against Harmon Electronics, Inc. The First Amended Complaint filed on October 29, 1993, requested $2,343,706 in civil penalties.

On March 5, 1993, while the EPA Administrative Complaint was pending, Harmon and MDNR entered into a state-court consent decree in which MDNR acknowledged full satisfaction, released all RCRA claims and waived any claim for monetary penalties in recognition of Harmon's voluntary self-reporting and prompt action. The decree required Harmon to perform certain further acts but did not impose any civil penalty. On December 15, 1994, the Administrative Law Judge ("ALJ") issued an order in the EPA proceeding finding Harmon liable for a civil penalty to $586,716. Harmon appealed the

---

1. This action is really a request for review of the final decision of the Environmental Appeals Board ("EAB") but the parties have filed cross-motions for summary judgment. The Court is not considering this case under the normal purview and standard of Federal Rule 56. Thus, even though the Court uses the parties' motion language, the Court is really deciding the merits of the appeal of the EAB and will apply the correct standard of review accordingly.

2. However, the solvents were not classified by the EPA as hazardous waste until 1980 when RCRA became effective. Thus Plaintiff contends improper disposal of hazardous waste could not have occurred prior to 1980. EPA agrees that the violations for which it seeks penalties first began between 1980 and 1982 because Plaintiff became subject to RCRA's requirements at that time.

ALJ's decision to EPA's three-judge Environmental Appeals Board ("EAB"). On March 24, 1997, the EAB affirmed the ALJ's initial decision and the $586,716 penalty. This action was filed on June 6, 1997, challenging the EPA's final order.

## II. STATEMENT OF FACTS

The following relevant background facts are not in dispute unless otherwise noted. Harmon Industries, Inc. assembles and manufactures control and safety equipment for use in the railroad industry. Harmon is the successor by merger to Harmon Electronics, Inc., the respondent named in EPA's administrative complaint. Harmon operates an assembly facility in Grain Valley, Missouri, where it assembles circuit boards for railroad equipment. From 1973 until December of 1987, Harmon's employees used organic solvent, contained in small jars at their work stations, to clean soldering flux from the equipment being assembled at the Grain Valley facility. Use of the organic solvents for this purpose was a common practice in the industry at the time. Until November of 1987, Harmon's employees collected solvent residues remaining in the bottoms of the jars in 3 to 5 gallon pails. Every 1–3 weeks, one of Harmon's maintenance workers would dispose of the spent solvents by throwing them out the back door of Harmon's assembly plant onto the ground.[3] Harmon contends the great majority of the solvents evaporated after they were thrown out the back door. Approximately 30 gallons of the solvent residues were dumped onto the ground at the facility per month from 1973 to 1987.

Prior to November of 1987, Harmon's management was unaware of this manner in which Harmon employees disposed of the residues of the solvents used in its assembly operations. Harmon's management assumed that employees used the solvents until depleted, and that, since the liquid was highly volatile and in such small quantities, any remainder simply evaporated. During a routine safety inspection in November of 1987, Harmon's personnel manager learned that

maintenance employees had been emptying the contents of a small pail, kept at the end of an assembly bench, out the back door. Thereafter, Harmon's management ordered the maintenance employees to stop the method of disposal and ordered an investigation.

In December of 1987, Harmon changed its assembly process to a state of the art technology using a nonhazardous cleaning material to remove flux from equipment being assembled. As a result, Harmon ceased generating hazardous waste. Harmon contends that the change to its assembly process had an initial cost exceeding $800,000 and has ongoing annual costs of approximately $125,000. Harmon hired consultants to investigate the effects of the disposal practice on the soils and groundwater at the site. In May of 1988, one of Harmon's consultants, International Technology Corporation ("ITC"), analyzed the data previously collected, and issued its "Phase I Report." The report found that freon, TCA, toluene, methylene chloride and xylene were present in the soil but the contamination did not appear to present a danger to human health or the environment.

On June 27, 1988, Harmon met with MDNR, discussed the investigation and provided a copy of the Phase I Report to MDNR. MDNR is the state agency authorized by EPA to administer the RCRA hazardous waste program in Missouri. The State of Missouri was authorized to administer its own hazardous waste program on November 20, 1985. Since first authorizing the State of Missouri to implement RCRA's hazardous waste program, EPA has taken no action to withdraw the state's authorization pursuant to RCRA § 3006(e), 42 U.S.C. § 6926(e).

After the meeting with Harmon, MDNR oversaw the investigation and the cleanup of Harmon's facility. The EPA received copies from MDNR of some of Harmon's reports and plans to MDNR, but the EPA denies receiving all the reports. Prior to Harmon's voluntary notification to MDNR in June 1988, neither MDNR nor EPA were aware of

---

**3.** The solvents found in the soil were 1,1,1-trichloroethane ("TCA"), freon, trichloroethylene ("TCE"), toluene, xylene and methylene chloride. These solvents, when discarded, are classified as hazardous wastes under RCRA.

the discontinued solvent disposal practice, or of the contamination of the soil at the immediate disposal area. Following further investigations approved by MDNR, Harmon's consultant, ITC, issued a "Phase II Report." The Phase II report concluded that, since the environmental risk presented by the discontinued disposal practice was low, a viable option would be to leave the organic compounds in the ground with a very small risk of future environmental problems. This conclusion was based upon the fact that (1) health concerns to either humans or aquatic life from chemical exposure were virtually nonexistent or within safe levels; and (2) neither the surface water nor the limited groundwater at the site exhibited any detrimental effects. In approximately July of 1992, Harmon submitted to MDNR its consultant's report summarizing the results of its even more extensive Phase III investigation. The Phase III report concluded that Harmon's discontinued solvent disposal practice "did not pose a threat to human health or the environment, based on: the low levels of contamination in the soil and groundwater; the absence of exposure pathways to reasonable groundwater receptor organisms; and the lack of both groundwater resources and water well users in the area." Initial Decision at 19.

Harmon submitted a closure report to MDNR on February 1, 1996. MDNR approved the report on June 10, 1996, and issued Harmon a post-closure permit on July 31, 1996. Harmon contends its investigation at the site cost over $1.4 million, excluding attorney's fees and other indirect costs as of the EPA administrative hearing in January of 1994. Harmon anticipated additional environmental costs of over $500,000 during the 30-year post-closure period. MDNR required Harmon to comply with RCRA's financial assurance and liability requirements. Financial assurance regulations are designed to insure that there will be sufficient funds to properly close a facility. Liability insurance regulations are designed to lessen the risk of uncompensated injuries from operation of hazardous waste disposal facility. Harmon's financial insurance instrument was executed on November 22, 1991. Harmon deposited approximately $190,000 into a trust account to secure the performance of closure and post-closure work at the site. The trust had a value of $310,000 at the time of the administrative hearing in January of 1994.

In the fall of 1991, Harmon's insurance agent inquired into obtaining sudden and non-sudden accidental insurance coverage for the facility. The agent found that there were only two "reasonably solvent and solid" insurance companies issuing environmental liability coverage; however, that coverage did not satisfy RCRA requirements. Accordingly, Harmon requested a variance from RCRA's liability insurance requirements from MDNR on November 25, 1991, and again on February 25, 1992. At the time of the execution of the state-court consent decree on March 5, 1993, Harmon had no insurance coverage for environmental liability. The consent decree states that "Harmon must provide MDNR documentation on a semi-annual basis that it is continuing to attempt to obtain liability insurance." The decree further provides that "MDNR, pursuant to its enforcement discretion, shall not bring an enforcement action against Harmon." As required by the state-court consent decree, Harmon's insurance agent made further efforts to obtain the required liability insurance coverage for Harmon in April and October 1993. On each occasion, the agent concluded that no reliable and financially responsible insurance carriers provided coverage that satisfied the RCRA regulations.

In September of 1991, after several months of negotiations, Harmon received a first draft of a consent decree from the Missouri Attorney General's Office. Revisions were made and Harmon signed the proposed decree on November 19, 1992. The MDNR signed it on January 4, 1993. On March 5, 1993, the State of Missouri filed a Petition against Harmon, together with the proposed consent decree in the Circuit Court of Jackson County, Missouri. The Petition alleged that "Harmon used solvents, including but not limited to, 1,1,1-trichlorethane and Freon, primarily for the removal of soldering resin from circuit boards assembled at its facility." The Petition further alleged that "[s]pent solvents from the facility were disposed of by pouring them on the ground

outside the facility." The Petition also alleged that Harmon had failed to register as a hazardous waste generator, had operated a hazardous waste treatment, storage and disposal facility without a permit or interim status, and had failed to use a permitted hazardous waste disposal facility. On March 5, 1993, the Jackson County Circuit Court approved and entered the consent decree. The decree specifically provided that "Harmon's compliance with this Consent Decree constitutes full satisfaction and release from all claims arising from allegations contained in plaintiff's petition." The decree also provided that "the provisions of this Consent Decree shall apply to all persons, firms, corporations and other entities who are or will be acting in concert and in privity with, or on behalf of, the parties to this Decree or their servants, employees, successors and assigns." The Consent Decree did not impose a monetary penalty upon Harmon.

By letters dated May 29, 1990 and October 15, 1990, EPA Region VII informed MDNR of EPA's views concerning the proper treatment of Harmon's conduct under EPA's RCRA enforcement policy, including EPA's view that MDNR should assess monetary penalties against Harmon. EPA's May 29, 1990 letter stated that if MDNR did not initiate a formal enforcement action (including a demand for monetary penalties) within 30 days, Region VII would consider initiating its own enforcement action against Harmon. The October 15, 1990, letter, stated that if MDNR did not initiate a formal enforcement action seeking monetary penalties against Harmon within 30 days, Region VII would take its own action. Harmon contends it had no knowledge of EPA's position until after EPA filed its administrative complaint. EPA has never contended that the terms of the state court consent decree violate RCRA or exceed the scope of MDNR's enforcement authority under the statute, nor has EPA expressed disagreement with MDNR's conclusion that the site poses no significant threat to human health or the environment. EPA has never attempted to intervene in Harmon and MDNR's implementation of the requirements of the RCRA hazardous waste landfill closure program.

More than 16 months after its first letter to MDNR concerning Harmon, EPA Region VII filed an administrative complaint against Harmon on September 30, 1991. The administrative complaint consisted of four counts, alleging: (1) operation of a hazardous waste landfill without a permit or interim status; (2) failure to have a groundwater monitoring program for a hazardous waste landfill; (3) failure to establish and maintain financial assurance for closure and post-closure of its landfill; and (4) failure to provide timely notification and/or register as a hazardous waste generator.[4] Region VII initially sought penalties totaling $2,777,324. The First Amended Complaint sought $2,343,706 in penalties. During the proceeding before the Administrative Law Judge ("ALJ"), EPA Region VII conceded that all the violations for which it sought penalties first began between 1980—1982. The ALJ found for the EPA on all counts and held an evidentiary hearing on January 12–14, 1994, to determine the appropriateness of the proposed penalty. The ALJ issued an initial decision on December 12, 1994, and rejected Region VII's proposed penalty of $2,343,706 and instead assessed a penalty of $586,716 pursuant to EPA's RCRA Civil Penalty Policy and Civil Enforcement Policy.[5] Harmon appealed the ALJ's decision to the EAB and the EAB heard oral argument on May 1, 1996. The EAB affirmed the ALJ's initial decision on March 24, 1997. Harmon filed the instant action on June 6, 1997, challenging EPA's final order.

## III. DISCUSSION

### A. Standard of Review

█ Review of final administrative decisions such as the EAB's final order affirming

---

4. The regulations upon which Region VII's administrative complaint is based became effective between 1980 and 1982. They are section 3005(e) of RCRA, 42 U.S.C. § 6925(e), 40 C.F.R. § 270.70, 45 Fed.Reg. 33,232, 47 Fed.Reg. 15,-032, and 47 Fed.Reg. 16,544.

5. Specifically, the ALJ imposed penalties for major potential of harm under Count I of $141,050, Count II of $135,005, Count III of $251,875, and for moderate potential of harm under Count IV of $52,714.

the ALJ's decision falls under the Administrative Procedure Act ("APA"), 5 U.S.C. § 706. In reviewing the EPA's construction of a statute, a reviewing court must "defer to administrative agency interpretations only if they are consistent with the plain meaning of a statute or are reasonable constructions of ambiguous statutes." *Iowa Util. Bd. v. FCC*, 120 F.3d 753, 793 (8th Cir.1997) (citing *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842–45, 104 S.Ct. 2778, 2781–83, 81 L.Ed.2d 694 (1984). Thus, a reviewing court may "overturn an agency interpretation when the interpretation conflicts with the plain meaning of a statute, when the interpretation is an unreasonable construction of an ambiguous statute, or when an agency acted arbitrarily or capriciously in adopting its interpretation." *Id.* at 793 (citing *Chevron*, 467 U.S. at 842–45, 104 S.Ct. 2778 and 5 U.S.C. § 706). Plaintiff argues that the EPA's penalty assessment is contrary to law and should be set aside because 1) EPA does not have statutory authority to seek a civil penalty; 2) EPA's civil penalty is barred by res judicata; 3) EPA's civil penalty is barred by the statute of limitations; and 4) EPA's penalty is arbitrary, capricious, an abuse of discretion, and not supported by substantial evidence in the record as a whole. Each of Plaintiff's arguments shall be addressed in turn.

*B. Overfiling or Overriding State Action*

 The RCRA permits the EPA to delegate authority to enforce the regulations to states which meet certain criteria. RCRA § 3006(a), 42 U.S.C. § 6926(a). When a state is authorized to administer and enforce a hazardous waste program the "[S]tate is authorized to carry out such program[s] *in lieu* of the Federal program ... unless, within ninety days following submission of the application the Administrator notifies such State that such program may not be authorized and, within ninety days following such notice and after opportunity for public hearing, he finds that (1) such State program is not equivalent to the Federal program under this subchapter, (2) such program is not consistent with the Federal or State programs applicable in other States, or (3) such program does not provide adequate enforcement of compliance with the requirements of this subchapter." RCRA § 3006(b), 42 U.S.C. § 6926(b) (emphasis added). Harmon argues that the MDNR operated in lieu of a federal EPA program, thus the penalties imposed by the MDNR should be final because RCRA section 3006(d) states "[a]ny action taken by a State under a hazardous waste program authorized under this section shall have the same force and effect as action taken by the Administrator under this subchapter." RCRA § 3006(d), 42 U.S.C. § 6926(d). Plaintiff claims that since MDNR had authority to act in Missouri and the consent decree approved by the Jackson County Circuit Court on March 5, 1993, states that it "constitutes full satisfaction and release from all claims arising from allegations contained in plaintiff's petition," the EPA does not have statutory authority to seek a civil penalty because the state settlement is final and binding.

EPA argues that the plain language of the statutes, the statutes' important health and safety objectives and the RCRA's legislative history show that the EPA is not precluded from taking its own enforcement action against a state and imposing a civil penalty. Alternatively, EPA argues that if the statutes are ambiguous then its construction of its enforcement authority is reasonable. EPA contends that RCRA section 3008(2) allows the EPA to impose a civil penalty whenever it determines there has been a violation and it gives the state notice. 42 U.S.C. § 6928. The statute states:

(2) In the case of a violation of any requirement of this subchapter where such violation occurs in a State which is authorized to carry out a hazardous waste program under section 6926 of this title, the Administrator shall give notice to the State in which such violation has occurred prior to issuing an order or commencing a civil action under this section.

EPA claims it gave MDNR notice twice by letter, once on May 29, 1990, and again on October 15, 1990, and thereafter filed suit on September 30, 1991. EPA contends that RCRA section 3006, 42 U.S.C. § 6926, does not modify the plain language of the EPA's enforcement authority in section 3008, 42

U.S.C. § 6928. EPA argues that the "in lieu of" language in section 3006(b), 42 U.S.C. § 6926(b), does not limit EPA's enforcement in an authorized state but rather just indicates that the State regulations become the body of regulations with which a facility must comply. EPA also claims that section 3006(d), 42 U.S.C. § 6926(d), the "same force and effect" language, only defines the scope of State authority and does not diminish federal authority. Thus EPA contends that the states can have hazardous waste programs but the EPA can always override, or overfile, the state's enforcement action.

Plaintiff contends that the plain language of the statutes only allow the EPA to override state enforcement actions when the EPA withdraws authorization pursuant to section 3006(e) which states:

> [w]henever the Administrator determines after public hearing that a State is not administrating and enforcing a program authorized under this section in accordance with the requirements of this section, he

shall so notify the State and, if appropriate corrective action is not taken within a reasonable time, not to exceed ninety days, the Administrator shall withdraw authorization of such program and establish a Federal program pursuant to this subchapter. The Administrator shall not withdraw authorization of any such program unless he shall first have notified the State, and made public, in writing, the reasons for such withdrawal.

42 U.S.C. § 6926(e). It is undisputed that the EPA has not withdrawn authorization from MDNR. Thus, Plaintiff argues that MDNR had authority under section 3006 to enforce its hazardous waste program and that the consent decree has the same force and effect as a consent decree signed with the EPA. The EPA could withdraw MDNR's authority to operate the program pursuant to section 3006 or could enforce a violation, when the state remains inactive, after giving notice pursuant to section 3008.[6]

**6.** In fact the case citations given by the Defendants support this point. For example, *Wyckoff Co. v. EPA*, 796 F.2d 1197 (9th Cir.1986); *United States v. Conservation Chemical Co. of Ill.*, 660 F.Supp. 1236 (N.D.Ind.1987); *United States v. Environmental Waste Control, Inc.*, 698 F.Supp. 1422 (N.D.Ind.1988); *Waste Management of Illinois v. U.S. EPA*, 714 F.Supp. 340 (N.D.Ill.1989); *United States v. Rogers*, 685 F.Supp. 201 (D.Minn.1987); and *USG Corp. v. Brown*, 1997 WL 89229, *6 (N.D.Ill.1997) all argue that the EPA is free to either bring an action in an RCRA authorized state when that state fails to act after the EPA gives notice to the state or withdraw authorization to that state. "Finally, if the Administrator determines that the state is not administering its program in accordance with the RCRA, he shall notify the state; if appropriate action is not taken, the Administrator is required to withdraw authorization from the state program." *Waste Management of Illinois*, 714 F.Supp. at 341. None of the above cases involved an authorized state action which culminated in a judgment whereupon the EPA sought to impose additional requirements as is the case here.

Plaintiff cites *Horizon Coal Corp. v. U.S.*, 876 F.Supp. 1512 (N.D.Ohio 1993), *rev'd on other grounds*, 43 F.3d 234 (6th Cir.1994). Horizon involved the construction of the Surface Mining Control and Reclamation Act ("SMCRA"). The district court held that section 1232, reclamation fees, is an exception to section 1235 of the act which provides exclusive responsibility and implementation authority to the states with approved programs. 876 F.Supp. at 1516. Thus,

the district court ruled that the state had concurrent authority with the federal government over reclamation fees and therefore the federal government was collaterally estopped from seeking fees already determined by the state. *Id.* at 1518. The court opinion:

> [i]t would be against public policy to promulgate a law whereby states can apply for and receive authorization from the United States to aid in the implementation and enforcement of that law if subsequent decisions issued under the authority of just such an approved program are not to be considered binding upon the United States. Parties should be able to rely upon decisions made by the duly authorized state agency, without having to worry that the United States may, at any time, assess fees, interest, and penalties inconsistent with the state's decision.

*Id.* The court continued:

> [i]f the United States is dissatisfied with the way the State of Ohio is administering and/or enforcing its previously authorized program, the United States can withdraw its approval of that program and/or administer the provisions of the SMCRA itself. Until it does so, parties are entitled to rely on determinations made by the state agency without having to worry that the United States will 'second guess' those decisions.

*Id.* (citation omitted). The Sixth Circuit reversed the district court's opinion that the state and federal government had concurrent authority over reclamation fees and held that the federal government has ultimate authority pursuant to sections 1232 and 1235. 43 F.3d at 241. Accord-

Thus, Plaintiff contends that the EPA may act when the state does not act and subsequently the EPA could withdraw the state authorization. Plaintiff points to some legislative history in support of its position that MDNR has concurrent authority with the EPA. "It is the Committee's intention that the States are to have primary enforcement authority and if at anytime a State wishes to take over the hazardous waste program it is permitted to do so, provided that the State laws meet the Federal minimum requirements for both administering and enforcing the law." H. Rep. 1491, 94th Cong., 2nd Sess. 24, *reprinted in* 1976 U.S.Code Cong. & Admin. News 6262. "If the Administrator finds that the state program is consistent with other state programs and equivalent to the federal program, the Administrator is then required to authorize the state to implement its state hazardous waste program in lieu of the federal program." Id. at 29, 1976 U.S.Code Cong. & Admin. News at 6267.

> This legislation permits the states to take the lead in the enforcement of the hazardous wastes [sic] laws. However, there is enough flexibility in the act to permit the Administrator, in situations where a state is not implementing a hazardous waste program, to actually implement and enforce the hazardous waste program against violators in a state that does not meet the federal minimum requirements. Although the Administrator is required to give notice of violations of this title to the states with authorized state hazardous waste programs the Administrator is not prohibited from acting in those cases where the state fails to act, or from withdrawing approval of the state hazardous waste plan and implementing the federal hazardous waste program pursuant to title III of this act.

Id. at 31, 1976 U.S.Code Cong. & Admin. News at 6269.

> Further, the Administrator, after giving the appropriate notice to a state that is authorized to implement the state hazardous waste program, that violations of this Act are occurring and the state failing to take action against such violations, is authorized to take appropriate action against those persons in such state not in compliance with the hazardous waste title.

> Therefore, a state retains the primary authority to implement its hazardous waste program so long as such program remains equivalent to the federal minimum standards. If the state program does not remain equivalent to the federal minimum standards then the Administrator is authorized to implement the hazardous waste provisions of this Act in such state.

Id. at 32, 1976 U.S.Code Cong. & Admin. News at 6270. Thus, the legislative history supports Harmon's contention that the EPA can act in an authorized state if the state fails to take action and the EPA gives notice.

This issue in the context of RCRA appears to be one of first impression. The Court finds that the plain language of section 3006(b) provides that the MDNR operates "in lieu of" or instead of the federal program. Authorization of the state program shall not be given unless 1) the state program is equivalent to the federal program; 2) the state program is consistent with federal or state programs applicable in other states; and 3) the state program provides adequate enforcement of compliance with the requirements of the chapter. 42 U.S.C. § 6926(b).[7] The concept of co-existing enforcement powers is inconsistent with EPA's delegation of authority and the legislative history. Indeed, such a concept would predictably result in confusion, inefficiency, duplicative agency expenditures and would thwart the public policy of early and non-judicial dispute reso-

---

ingly, the Sixth Circuit found the principles of collateral estoppel inapposite as the state did not have authority over the issue. *Id.* In this case, MDNR and EPA have concurrent authority over the RCRA. Therefore, the original discussion in the district court's opinion regarding collateral estoppel is compelling and consistent with this Court's views.

**7.** Additionally, the Court notes that RCRA § 1003, 42 U.S.C. § 6902, provides that the ob-

jectives of the chapter are to promote the protection of health and the environment and to conserve valuable resources by "establishing a viable Federal–State *partnership* to carry out the purposes" of the chapter and that the Administrator will "give a high priority to assisting and cooperating with States in obtaining full authorization of State programs" (emphasis added).

lution. The Memorandum of Agreement Between the State of Missouri and the United States Environmental Protection Agency ("Agreement") states that "[t]he Director and the Regional Administrator agree to maintain a high level of cooperation and coordination between their respective staffs in a full partnership to assure successful and effective administration of the State program." Def.s' Ex. 27 at 2. Otherwise stated, the state program and the federal program are essentially in a cooperative effort to ensure compliance with the hazardous waste program. As such, the "same force and effect" language of section 3006(d) means exactly what it says. Any action by a state shall have the same binding effect as if the action was taken by the EPA.

The Agreement defines the respective responsibilities of the parties. It provides that the "State assumes primary responsibility for implementing the authorized provisions of the RCRA ... EPA retains its responsibility to ensure full and faithful execution of the requirement of RCRA, including direct implementation of the HSWA [Hazardous and Solid Waste Amendments of 1984] and of the full RCRA program in the event the State is unable to act as a result of not having adequate enforcement capability or authorization status or in the event EPA exercises its enforcement authority to override state action." *Id.* The Agreement requires the EPA to provide notice when it intends to take enforcement action if the state has not acted. The EPA is required to refer the matter to the Attorney General when it believes a civil penalty should be assessed against a violator. Neither the Agreement nor the statutes give the EPA specific authority to override the state agency's determination of the appropriateness of a civil penalty. Section 3006(e) of the RCRA gives the EPA only the option of withdrawing authorization of a state program which fails to administer or enforce the program; not the option to reject part of a program or course of action on an incident-by-incident basis because the EPA believes the *penalty* to be inadequate. 42 U.S.C. § 6926(e) (emphasis added).[8] Certainly, such a schizophrenic approach to enforcement of RCRA would result in uncertainty in the public mind. With whom should it negotiate? Must it negotiate with both state and federal authorities? Should it insist that EPA sign off on all agreements with authorized state agencies?

The Court further finds that section 3008(2) does not conflict with section 3006 in as much as the EPA can override a state program's administration or lack of enforcement pursuant to section 3006(e). In this case, MDNR signed a consent decree and the issue has effectively been resolved. The EPA does not and should not have the authority to impose its own separate penalties after Plaintiff negotiates a settlement with an authorized state agency and that settlement is approved by an appropriate state judicial authority.[9] Were it otherwise, none of the state's powers would ever have the "same force and effect" because the EPA could modify, by piecemeal measures, any action taken by the states. This Court does not believe that the EPA's interpretation of RCRA supports the purposes behind authorizing state hazardous waste programs.[10] Therefore, Plaintiff's motion for summary

8. The Court finds it interesting that the EPA only focused on seeking a penalty in this case. The EPA does not take issue with MDNR's investigation, cleanup or enforcement of RCRA, but only takes issue with MDNR's choice not to pursue a penalty. Therefore, the Court finds the objectives of RCRA were met through the actions of the MDNR and finds it somewhat disconcerting that the only argument regarding MDNR's effectiveness concerns money.

9. By the same token, the State of Missouri could not elect to pursue additional penalties or enforcement action against Plaintiff for the same violations of the hazardous waste regulations after the consent decree was signed.

10. Even if some ambiguity in the statutes does exist, as the EPA alternatively argues, the Court does not find the EPA's interpretation of its enforcement authority reasonable in this case. The MDNR was acting within its authority to administer the requirements of the hazardous waste program and ultimately, after several years of investigation and clean-up, Plaintiff settled the claims. The EPA's interpretation of the statutes would lead to duplicative and inconsistent judgments, waste scarce resources, and undermine public confidence in government.

judgment on this point is granted and Defendants' motion is denied.

### C. Res Judicata

 Plaintiff also argues that not only do the statutes themselves prevent the EPA from overfiling claims once the state has acted and settled, but also the principle of res judicata bars the EPA's enforcement action. The United States Supreme Court has held that 28 U.S.C. § 1738 (1982) requires federal courts to give res judicata effect to state court judgments whenever the courts of the state from which the judgment emerged would give such effect. *Hickman v. Electronic Keyboarding, Inc.*, 741 F.2d 230, 232 (8th Cir.1984) (citing *Migra v. Warren City Sch. Dist. Bd. of Educ.*, 465 U.S. 75, 81, 104 S.Ct. 892, 79 L.Ed.2d 56 (1984) and, *Kremer v. Chemical Const. Corp.*, 456 U.S. 461, 464, 102 S.Ct. 1883, 72 L.Ed.2d 262 (1982)). Plaintiff argues that the consent decree between Plaintiff and MDNR is entitled to the same preclusive effect as any other judgment.

 Under Missouri law, "estoppel by a former judgment, or res judicata, requires: (1) identity of the thing sued for; (2) identity of the cause of action; (3) identity of the persons and parties to the action; and (4) identity of the quality of the person for or against whom the claim is made." *Hickman*, 741 F.2d at 232 (citing *Prentzler v. Schneider*, 411 S.W.2d 135, 138 (Mo.1966) (en banc)). Plaintiff argues three of the elements are easily established. First, identity of the thing sued for, is satisfied because the "subject matter of the suit" is identical in the state court case and this action because both seek to enforce the hazardous waste program regulations. Second, identity of the cause of action, is satisfied because both MDNR's court case and the EPA's complaint seek to enforce regulations based on the same facts and law. Third, identity of the quality of the person for or against whom the claim is made, is satisfied because Harmon was the named defendant in both actions and neither MDNR or the EPA claim the successive actions were presented with the agencies in a particular capacity or status such as trustee or executor. The Court agrees with Plaintiff that three of the elements are easily met and focuses on the parties' dispute regarding privity, or the fourth element.

 The fourth element, identity of the persons and parties to the action, requires that the earlier litigation must have involved the same parties or their privies. Under Missouri law, privity is defined as:

> [P]rivity depends more upon the relation of the parties to the subject matter than upon their connection as parties with or any activity in the former litigation .... Privity connotes those who are in law so connected with a party to the judgment as to have such an identity of interest that the party to the judgment represented the same legal right; and where this identity of interest is found to exist, all are alike concluded and bound by the judgment.

*Hickman*, 741 F.2d at 233.[11] EPA argues that it does not share an identity of interests with the state authorized to administer the RCRA program and that it was therefore not in privity to the state court action and consent decree signed by Plaintiff and MDNR.

Plaintiff contends that the "federal-state partnership" establishes privity, the "same force and effect" and "in lieu of" language connote privity and since both agencies were acting on behalf of the public to enforce RCRA's requirements, they have the same relationship to the subject matter. In *Hickman*, the Eight Circuit held that an individual was in privity with the Missouri Human Rights Commission ("MCHR") when the MCHR filed a complaint against the individual's employer. The employee could not then sue the employer separately because the MCHR had already received a judgment against the employer and the MCHR's actions were taken for the interests of the individual. 741 F.2d at 232. EPA argues

---

11. *See also Midcontinent Broadcasting Co. v. Dresser Ind., Inc.*, 669 F.2d 564, 566 (8th Cir. 1982) (holding that "[f]or purposes of res judicata a cause of action is comprised of the facts which establish the right which a party seeks to enforce through litigation. In determining whether a cause of action is the same, one has to determine whether a wrong for which redress is sought is the same for both actions.") (citation omitted).

that it has different interests and motives than the MDNR for seeking penalties for the hazardous waste program.[12] However, the Court finds *Hickman* instructive as to the meaning of identity of interest and finds the EPA and the MDNR in privity. *Hickman* found the parties were in privity even though MCHR's interests and the employee's interests in the lawsuit may not have been identical but because the same legal rights were asserted. *Id.*[13] Once the state court approved the settlement negotiated between Harmon and MDNR, *Hickman* forecloses further penalties imposed by EPA.

Because MDNR was authorized as a state agency and the underlying interests are nearly identical, EPA is barred from seeking civil penalty violations through res judicata. Therefore, Plaintiff's motion for summary judgment on this point is granted and Defendants' motion is denied.

### D. Statute of Limitation

■ Plaintiff argues that EPA's civil penalty action is barred by the statute of limitations. Plaintiff contends that its disposal practice commenced almost 25 years ago in approximately 1973. Harmon was subject to the EPA's RCRA regulations in 1982 and EPA could have first sued Harmon in 1982, but EPA did not file its administrative complain until 1991. EPA contends that it is not barred from imposing a penalty against Harmon because the violations were "continuing violations" and tolled the statute.

The federal statute of limitations found in 28 U.S.C. § 2462 provides:

> Except as otherwise provided by Act of Congress, an action, suit or proceeding for

the enforcement of any civil fine, ... [or] penalty ... shall not be entertained unless commenced within five years from the date when the claim first accrued.

Plaintiff contends the time which the EPA could have sued began at the moment of the violation. EPA argues that Plaintiff violated RCRA from 1973 to 1987 and therefore had continuously violated RCRA requirements within five years preceding the filing of EPA's Complaint. The ALJ's penalties were imposed for the period beyond September 30, 1986.

The Court agrees with the EPA. The regulations are not meant to reward long term repetitive violators of RCRA who escape getting caught within the five year statute of limitations. RCRA imposes continuing obligations on persons who generate and manage hazardous waste. RCRA requires notification in order to transport, store or dispose of hazardous waste and requires a permit to operate a facility that treats, stores or disposes of waste. RCRA §§ 3005 & 3010, 42 U.S.C. §§ 6925 & 6930. The Supreme Court in *Havens Realty Corporation v. Coleman* recognized the continuing violation doctrine. The Court applied it to the one-hundred eighty day limitation period under the Fair Housing Act for "continuing violations" in contrast with "one discrete act of discrimination." 455 U.S. 363, 380, 102 S.Ct. 1114, 1125, 71 L.Ed.2d 214 (1982) ( "[s]tatutes of limitations ... are intended to keep stale claims out of the courts. Where the challenged violation is a continuing one, the staleness concern disappears."). Additionally, one recent court decision held that the failure to comply with RCRA closure requirements

---

12. In argument and in its brief, EPA urges the Court to believe that MDNR was inappropriately lenient to Harmon because of some undefined self-interest. The EPA vaguely hints that Missouri may have sought to avoid appearing hostile to the interests of business and industry in general. Presumably, a friendly approach to enforcement would encourage other industries and businesses to locate and remain within the state. If EPA sincerely embraces the position it urges upon the Court, one wonders why it has not withdrawn authorization pursuant to § 3006(e). It is noteworthy that the EPA must have found that MDNR provided "... adequate enforcement of compliance with the requirements of this subchapter" when it approved Missouri's applica-

tion for authorization pursuant to § 3006(a). The position taken by EPA in this proceeding is puzzling.

13. *See Midcontinent,* 669 F.2d at 566. *Also see U.S. v. ITT Rayonier, Inc.,* 627 F.2d 996, 1001–02 (9th Cir.1980) which held that under the Federal Water Pollution Control Act ("FWPCA") (which provides EPA and authorized state agencies concurrent enforcement authority the EPA could not invoke FWPCA because "the existence of concurrent enforcement powers does not per se negate the application of res judicata principles.") (citation omitted).

for hazardous waste sites is a continuing violation under 28 U.S.C. § 2462. *Cornerstone Realty, Inc. v. Dresser Rand Co.,* 993 F.Supp. 107, 114–15 (D.Conn.1998).

In this case, the Plaintiff continuously violated provisions of the RCRA from the inception of the Act until 1987. The Court finds that the continuing violation doctrine applies to Plaintiff's violations of the regulations and the statute of limitation runs from the date of the most recent violation. Therefore, Defendants' motion for summary judgment on this point is granted and Plaintiff's motion is denied.

### E. Arbitrary, Capricious and Abuse of Discretion

■■■ Plaintiff claims EPA's penalty assessment of $586,718 was arbitrary, capricious, and abuse of discretion, and not supported by substantial evidence in the record as a whole. When reviewing an administrative agency decision resolving factual disputes in the record the Court must uphold the decision if it is supported by substantial evidence. *Panhandle Co-op. Ass'n v. EPA,* 771 F.2d 1149, 1151–52 (8th Cir.1985). The Court must consider:

> whether the agency considered factors Congress did not intend it to consider; whether the agency failed entirely to consider an important aspect of the problem; whether the agency decision runs counter to the evidence before it; or whether there is such a lack of a rational connection between the facts found and the decision made that the disputed decision cannot "be ascribed to a difference in view or the product of agency expertise." If the agency itself has not provided a reasoned basis for its action, the court may not supply one.

*Downer v. United States,* 97 F.3d 999, 1002 (8th Cir.1996) (citations omitted). "The reviewing court may not substitute its judgment for that of the agency and must give substantial deference to agency determinations." *Id.* "The assessment of a penalty is particularly delegated to the administrative agency. Its choice of sanction is not to be

overturned unless 'it is unwarranted in law' or 'without justification in fact.'" *Panhandle,* at 1152.

■■■ RCRA requires that in assessing a penalty "the Administrator shall take into account the seriousness of the violation and any good faith efforts to comply with applicable requirements." RCRA § 3008(a)(3), 42 U.S.C. § 6928(a)(3). The RCRA provides that if a violator does not comply with a "compliance order" the Administrator may assess a civil penalty of not more than $25,-000 for each day of non-compliance and each person who violates the chapter may be subject to a $25,000 fee for each violation. RCRA § 6928(c). The EPA contends that the harm was very serious, Plaintiff failed to notify the EPA of its activity, failed to obtain a permit and failed to manage its wastes in a manner that protected human health and environment. The Complaint filed by the EPA initially requested penalties totaling $2,777,324. The ALJ rejected Region VII's proposed penalty and instead assessed a penalty of $586,716. Plaintiff contends that EPA's characterization of the "potential for harm," EPA's finding that Plaintiff failed to establish a financial assurance mechanism and obtain liability insurance, and EPA's failure to consider Plaintiff's good faith efforts and voluntary reporting were all arbitrary, capricious and an abuse of discretion.

EPA argues that substantial evidence supports EPA's penalty assessment. The ALJ found that EPA's 1990 Revised RCRA Civil Penalty Policy guidelines allow the EPA to take into consideration several factors in assessing the potential for harm. The ALJ found the potential for harm in this case to be "major" because Plaintiff failed to notify as a generator of hazardous waste, failed to comply with financial assurance requirements, operated without a permit and failed to install or conduct adequate groundwater monitoring. The ALJ determined that Plaintiff dumped over 3,000 gallons of hazardous waste solvents on the ground and found that the potential for harm was extremely high even though no actual injury to the health or environment was alleged.[14]

---

14. *See Panhandle,* 771 F.2d at 1152 finding that the ALJ did not abuse his discretion by imposing

The ALJ also found that Plaintiff was aware of the financial assurance requirements and did not attempt to comply in a timely fashion. Plaintiff disputes that it was aware of the need to comply with such requirements. Plaintiff says it disputed classification as a hazardous waste disposal facility but complied after notification. The ALJ did not believe Plaintiff was making a good faith legal challenge to RCRA's applicability and accordingly imposed a penalty. Plaintiff also asserts that it should not be penalized for failing to obtain liability insurance because it was unavailable. The ALJ found that Plaintiff only searched three companies for insurance and a more thorough search was warranted. The ALJ declined to excuse Plaintiff's lack of insurance. Plaintiff signed a consent decree in 1993, requiring Plaintiff to comply with RCRA's insurance requirements until closure certification was obtained. The ALJ did reduce the proposed penalty based on Plaintiff's self-reporting of the violations and cooperation with MDNR in implementing groundwater monitoring. The Court finds substantial evidence to support the ALJ's penalty assessment.

The ALJ's penalty determinations have not been shown to be "unwarranted in law" or "without justification in fact." Therefore, even though the Court need not reach this matter, the Defendants' motion on this point is granted and Plaintiff's motion is denied.[15]

### IV. CONCLUSION

For the foregoing reasons, Plaintiff's Motion for summary judgment is granted in part and denied in part and Defendants' Motion for summary judgment is granted in part and denied in part. The decision of the EAB is reversed and Plaintiff is relieved of the penalties imposed by the EAB. Because the issues ruled in favor of Plaintiff are dispositive, the Clerk is directed to enter judgment for Plaintiff on Plaintiff's Com-

plaint. Costs of this action are assessed to Defendants.

IT IS SO ORDERED.

---

a penalty after finding an "extremely high potential for harm even though no actual injury to human health or the environment was alleged."

**15.** The Court appreciates the apparent futility of ruling the issues addressed in III. D and III. E since the Court has determined that EPA lacks

the power to overfile in this case. Anticipating that the Defendants will appeal this Court's decision and acknowledging that the Eighth Circuit Court of Appeals may be of a different opinion, ruling the final two issues may avoid revisiting those issues at a later date.