**PONY EXPRESS RECORDS, INC., et. al. Plaintiffs/Counterclaim Defendants,**

v.

**Bruce SPRINGSTEEN, Defendant/Counterclaimant.**

**No. CIV.A. 98–4447.**

United States District Court, D. New Jersey.

June 22, 2001.

---

**32.** Union Carbide's motion for JMOL on inequitable conduct is moot in light of the court's ruling.

Frank J. Cozzarelli, Cozzarelli & Mautone, Belleville, NJ, for Plaintiffs.

Stephen M. Greenberg, Stern & Greenberg, Roseland, NJ, for Defendant.

## OPINION

ACKERMAN, District Judge.

This matter comes before the court on motion of defendant/counterclaimant, Bruce Springsteen ("defendant" or "Springsteen") for summary judgment dismissing with prejudice all claims of plaintiffs Pony Express Records, Inc.("Pony Express") and JEC Music USA, Inc.("JEC Music") (collectively "plaintiffs") and for summary judgment with respect to the issue of liability on each of his counterclaims and the award of statutory damages, costs and attorney's fees. For the reasons stated below, Springsteen's motion for summary judgment dismissing with prejudice all claims of plaintiffs is granted and Springsteen's motion for summary judgment with respect to the issue of liability on each of his counter claims is granted in part and denied in part. Springsteen's motion for award of costs and attorney's fees is reserved for trial.

### Background

In 1972, Springsteen entered into three written agreements with three different entities. The first agreement, dated March, 1972, was between Springsteen and Laurel Canyon Management, and provided that Laurel Canyon Management would act as Springsteen's personal manager ("Management Agreement"). The second agreement, dated March, 1972, was between Springsteen and Laurel Canyon Productions, and provided that Springsteen would render exclusive recording services to Laurel Canyon Productions, that his interest in those recordings would be

transferred to Laurel Canyon Productions, and that during the term of the agreement, Springsteen would not make any recordings for any other party ("Recording Agreement"). The third agreement, dated May, 1972, was between Springsteen and Sioux City Music, Inc.("Sioux, Inc."), and assigned to Sioux, Inc. the copyright to all songs Springsteen had written to date and any songs he would write during the agreement's term ("Songwriters Agreement").

Springsteen contends that each of the three entities with which he entered into agreements was jointly owned by James Cretecos ("Cretecos") and Michael Appel ("Appel"). Plaintiffs contend, however, that Cretecos was the sole owner of Sioux City Music, Inc., because Appel was an employee of a separate songwriting firm and wanted to keep his employment relationship with that firm distinct from his business relationship with Springsteen.

Sioux City Music, Ltd., (Sioux, Ltd.) was incorporated in the State of New York on October 5, 1972, and was jointly owned by Cretecos and Appel. Springsteen asserts that Sioux, Ltd. was the successor to the unincorporated Sioux, Inc. named in the Songwriter's agreement. In support of his claim, Springsteen cites the cover of his first album, released in 1973, which states that Sioux Ltd. owned the rights to the compositions contained therein, and the fact that prior to the album's release, Cretecos filed applications on behalf of Sioux, Ltd. to register copyrights in the album's compositions. Since Sioux, Ltd. never signed any agreement with Springsteen, Springsteen maintains that Sioux, Ltd. must have obtained its interest in Springsteen's songs as the successor to Sioux, Inc.. Springsteen also provided an affidavit from Appel's and Cretecos's attorney at the time, stating that the attorney believed that Sioux, Ltd. was the successor

in interest to Sioux, Inc., and that he had drafted and executed a short form assignment assigning all and any assets of Sioux, Inc. to Sioux, Ltd.. *See* Nathan Cert., Ex. 7 at para. 29. Plaintiffs assert, however, that there is no written evidence that Sioux, Ltd. is the successor to Sioux, Inc., and that Cretecos never surrendered his ownership of certain of Springsteen's unpublished work which he acquired as the sole owner of Sioux, Inc.

Sioux Ltd. filed an amendment to its Certificate of Incorporation on April 24, 1973, changing its name to Canyon Music, Ltd.. In or about 1974, Cretecos sold all of his interest in the Laurel Canyon Productions, Laurel Canyon Management, and Laurel Canyon Music (collectively "Laurel Canyon Companies") to Appel. On May 27, 1977, Springsteen, Appel and the Laurel Canyon Companies entered into agreements (the "Basic Agreement" and the "Co-publishing Agreement") which provided that, with the exception of certain songs identified as the "Joint Copyrights," none of the Laurel Canyon Companies (or their predecessors) had "any rights, entitlements, interests or claims ... in and to any musical compositions, melodies, lyrics, writings, audio recordings of any nature, films, tapes, performances and any and all other artistic creations, by, pertaining to or relating in whole or in part to Springsteen alone or with others....". Finally, on May 13, 1983, Appel and the Laurel Canyon Companies sold, assigned and transferred to Springsteen all their remaining rights, title and interest in and to any Springsteen compositions, including the Joint Copyrights.

Plaintiffs assert that the Basic Agreement does not clarify Springsteen's rights to the unpublished work claimed by Cretecos, because it does not include the appendix of specific materials transferred that it references in paragraph 9. Therefore, the

Basic Agreement does not provide evidence of whether songs rights belonging to Sioux, Inc. were transferred under the Basic Agreement.

On June 2, 1995, Cretecos sold his alleged interest in previously unpublished Springsteen compositions and sound recordings ("unpublished works") to JEC (the "JEC Agreement"). *See* Nathan Cert., Ex. 18. JEC subsequently purported to grant Pony Express an exclusive license to the sound recordings pursuant to a written agreement dated July 11, 1995. In 1995 and 1996, JEC obtained copyright registrations for Springsteen's unpublished work (*See* Complaint, Schedule A), representing in the copyright applications that the copyrights for the unpublished works had been transferred to JEC.

By written agreement dated March 13, 1997, Pony Express purported to grant to Masquerade Music ("Masquerade") an exclusive license to sell and distribute, in all territories other than the United States and Canada, a compact disc entitled "Before the Fame" containing certain of the previously unpublished compositions and sound recordings (the "License Agreement"). *See* Nathan Cert., Ex. 27. Among other things, the License agreement granted Pony Express and JEC Music the right to control the prosecution or defense of any litigation outside the United States and Canada regarding "Before the Fame."

Springsteen filed suit in the High Court of Justice, Chancery Division, in London, England on the grounds that Masquerade was not authorized to distribute his compositions and sound recordings. *See Bruce Springsteen v. Flute International Ltd. et al,* CH 1996–S–4998, CH 1996–S–7661, and *Bruce Springsteen v. Masquerade Music Ltd. et al,* CH 1997–S–1559 (collectively, the "UK Litigation"). Masquerade's defense to Springsteen's claim was that it had the right to exploit the compositions and sound recordings pursuant to the purported license from Pony Express and JEC, who in turn had received that right from Cretecos.

According to the Springsteen, the case went to trial in October of 1998 after extensive pretrial proceedings and lasted nearly two weeks. During the trial, Masquerade's counsel cross-examined Springsteen's witnesses, challenged Springsteen's evidence, and presented additional witnesses and evidence on Masquerade's behalf. Plaintiffs allege that Masquerade did not permit plaintiffs to participate in that litigation, despite the written agreement requiring Masquerade to do so, and so on March 16, 1998, plaintiffs terminated their licensing agreement with Masquerade.

On December 10, 1998, the UK Court issued a seventy-four page judgment in favor of Springsteen (the "UK Judgment"). *See* Nathan Cert., Ex. 23. The UK Judgment held that Cretecos did not have individual dealings with Springsteen, but only dealt with Springsteen in Cretecos's capacity as Appel's partner. *See id.* at 32–34. The UK court also found that Sioux, Inc. was owned jointly by Cretecos and Appel; that the copyrights in Springsteen's compositions were transferred to Sioux, Inc. pursuant to the May 1972 Songwriters Agreement; and that Sioux, Inc. was incorporated as Sioux, Ltd.. *See id.* at 34–39; 40–52. Springsteen subsequently obtained copyright registrations in 16 songs in or around January, 1999. *See* Nathan Cert., Ex. 25.

Plaintiffs filed a Complaint in this court on September 24, 1998, alleging copyright infringement, contributory infringement, conversion, breach of contract, unfair competition, and civil conspiracy, and requested declaratory judgment as to the parties' respective interests in the works in question, as well as damages and a preliminary

and permanent injunction. Springsteen filed an Answer and Counterclaim on January 8, 1999 against Pony Express and JEC Music ("counterclaim defendants"), alleging infringement, false designations of origin and false descriptions and representations, trademark infringement, unfair competition, misappropriation, passing off, unlawful, unfair and fraudulent business practices, and the making of false or misleading statements in connection with the offering for sale and sale of goods, and common law invasion of privacy and misappropriation of name and likeness, and requested declaratory judgment, injunctive relief, damages for infringement and impoundment of the infringing articles.

An essential element of each party's claims is that party's ownership of copyrights in Springsteen's unpublished works.[1] The issue of ownership turns upon whether Cretecos ever individually owned any of Springsteen's unpublished work and if so whether he retained ownership or transferred it with the sale of Sioux, Ltd. In his motion for summary judgment on plaintiffs' claims, Springsteen contends that the UK Judgment estops the plaintiffs from litigating the critical issue of whether Cretecos had obtained any individual interest in Springsteen's recordings through Springsteen's agreement with Sioux, Inc., and whether the property of Sioux, Inc. is distinct from the property of Sioux, Ltd.. Springsteen also contends that the undisputed material facts establish that Springsteen owns the copyright in the contested compositions and sound recordings, and therefore, Springsteen should be granted summary judgment. Finally, Springsteen argues that the plaintiffs' claims should be dismissed because plaintiffs have failed to prosecute those claims. Plaintiffs respond that the UK Judgment does not estop them from litigating in New Jersey, because they were prevented by Masquerade from participating fully in the UK litigation. Plaintiffs also contend that disputed issues of fact exist as to the copyright ownership in the songs. Finally, plaintiffs contest Springsteen's accusation of failure to prosecute. This court will first address the impact of collateral estoppel on Springsteen's motion for summary judgment as to plaintiffs' claims and will then address Springsteen's motion for summary judgment as to his own counterclaims.

### *Summary Judgment as to Plaintiffs' Claims*

Rule 56 of the Federal Rules of Civil Procedure provides that summary judgment may be granted only if the pleadings, supporting papers, affidavits, and admissions on file, when viewed with all inferences in favor of the nonmoving party, demonstrate that there is no genuine issue of material fact and that the movant is entitled to judgment as a matter of law. *See also Todaro v. Bowman*, 872 F.2d 43,

---

**1.** The elements of a copyright infringement claim are (1) ownership of a valid copyright in the works in question, (2) copying of original protectable elements of the works, and (3) sufficiently substantial copying to constitute improper application. *Feist Public., Inc. v. Rural Tel. Serv. Co., Inc.*, 499 U.S. 340, 361, 111 S.Ct. 1282, 113 L.Ed.2d 358 (1991); *Franklin Mint Corp. v. National Wildlife Art Exch.*, 575 F.2d 62, 65 (3d Cir.1978). Under 17 USC § 201, ownership of copyright initially vests in the author of a work, unless the work was made for hire, that is, for an employer. 17 USC § 201(a)-(b). Ownership may be transferred "by any means of conveyance or by operation of law". 17 USC § 201(d). In this case, the parties dispute only the first element of the infringement claim: who owned a valid copyright in the works in question. Springsteen alleges, and plaintiffs/counterclaim defendants do not deny that plaintiffs' non-copyright claims (conversion, breach of contract, unfair competition, and civil conspiracy) rely on the premise that plaintiffs own the copyrights in question.

46 (3d Cir.1989); *Chipollini v. Spencer Gifts, Inc.*, 814 F.2d 893, 896 (3d Cir.1987), *cert. dism'd*, 483 U.S. 1052, 108 S.Ct. 26, 97 L.Ed.2d 815 (1987). Put differently, "summary judgment may be granted if the movant shows that there exists no genuine issues of material fact that would permit a reasonable jury to find for the nonmoving party." *Miller v. Indiana Hospital*, 843 F.2d 139, 143 (3d Cir.1988), *cert. denied*, 488 U.S. 870, 109 S.Ct. 178, 102 L.Ed.2d 147 (1988). An issue is "genuine" if a reasonable jury could possibly hold in the nonmovant's favor with regard to that issue. *See Anderson v. Liberty Lobby. Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A fact is material if it influences the outcome under the governing law. *Id.* at 248, 106 S.Ct. 2505.

The party seeking summary judgment always bears the initial burden of production, i.e., of making a prima facie showing that it is entitled to summary judgment. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). This may be done either by demonstrating there is no genuine issue of fact and that as a matter of law, the moving party must prevail or by demonstrating that the moving party has not produced evidence relating to an essential element of the issue for which it bears the burden. *Id.* at 322–23, 106 S.Ct. 2548. Once either showing is made, the burden shifts to the nonmoving party who must demonstrate facts supporting each element for which it bears the burden as well as establish the existence of genuine issues of material fact. *Id.* at 324, 106 S.Ct. 2548.

At the summary judgment stage, however, a court may not weigh the evidence or make credibility findings-these tasks are left to the factfinder. *Petruzzi's IGA v. Darling–Delaware*, 998 F.2d 1224, 1230 (3rd Cir.1993). Therefore, to raise a genuine issue of material fact, " 'the [summary judgment] opponent need not match, item for item, each piece of evidence proffered by the movant,' but simply must exceed the 'mere scintilla' standard." *Id.; see also Anderson*, 477 U.S. at 252, 106 S.Ct. 2505 ("the mere existence of a scintilla of evidence in support of the [nonmovant's ] position will be insufficient; there must be evidence on which the jury could reasonably find for the [nonmovant].")

Springsteen asserts that the UK Judgment resolved essential elements of plaintiffs' case for which plaintiffs bear the burden of proof, and therefore plaintiffs are foreclosed from further litigating their claim in this action. Specifically, the UK court found that Cretecos did not have individual dealings with Springsteen, but only dealt with Springsteen in Cretecos's capacity as Appel's partner; that Sioux, Inc. was owned jointly by Cretecos and Appel; that the copyrights in Springsteen's compositions were transferred to Sioux, Inc. pursuant to the May 1972 Songwriters Agreement; and that Sioux, Inc. was incorporated as Sioux, Ltd.. *See* Nathan Cert., Ex. 23. at 32–39, 40–52. As a result, Springsteen contends that plaintiffs are collaterally estopped from litigating these issues in the instant case, because plaintiffs had the opportunity to participate in the UK litigation and did participate to a limited extent. Plaintiffs respond that they did not have a full and fair opportunity to participate in the UK litigation because their licensee, Masquerade, refused to involve the plaintiffs in the litigation from the outset. As a result, plaintiffs only participated to a very limited extent and are not estopped by that litigation.

██ Generally, preclusion is based on the Full Faith and Credit clause, U.S. Const. art. IV, § 1, or on 28 U.S.C.

§ 1738 (1994);[2] however, a foreign country's judgments are not subject to the Full Faith and Credit clause or § 1738, and no other federal law or treaty governs the recognition of a foreign country's judgments. *See* Philip L. McGarrigle, *The Role of Foreign Judgments in Patent Litigation: A Perspective and Strategic Overview*, 39 IDEA: J.L. & Tech. 107 (1998). Instead, in cases brought on a federal cause of action, recognition of such foreign judgments in federal court may be based on the doctrine of comity. *See* Wright, Miller & Cooper, *Federal Practice and Procedure: Jurisdiction* § 4473. Since the instant case concerns claims brought under federal copyright law and the Lanham Act, this court will consider the preclusive effects of the UK litigation under principles of comity.

■ In *Hilton v. Guyot*, 159 U.S. 113, 16 S.Ct. 139, 40 L.Ed. 95 (1895), the United States Supreme Court observed:

'Comity,' in the legal sense, is neither a matter of absolute obligation, on the one hand, nor of mere courtesy and good will, upon the other. But it is the recognition which one nation allows within its territory to the legislative, executive or judicial acts of another nation, having due regard both to international duty and convenience, and to the rights of its own citizens, or of other persons who are under the protection of its laws. *Id.* at 141. The *Hilton* court found that if the foreign judgment was entered by a competent court, having both personal and subject-matter jurisdiction, if the judgment was brought upon due allegations and proofs, giving the parties opportunity to defend against the claims, and if the judgment is entered in a clear and formal record, then "the judgment is prima facies evidence, at least, of the truth of the matter adjudged; and it should be held conclusive upon the merits tried in the foreign court," unless there is a special ground on which to impeach the judgment. *Id.* at 159–160. *See also Bank of Montreal v. Kough*, 612 F.2d 467 (9th Cir.1980); *Leo Feist, Inc. v. Debmar Publishing Co.*, 232 F.Supp. 623 (E.D.Pa.1964)

■ The UK litigation and judgment satisfy all the *Hilton* requirements. The litigation took place in the High Court of Justice, Chancery Division. The subject of the litigation was a violation of the British Copyright Act of 1956, which the British court had jurisdiction to adjudicate. The parties to the litigation were Bruce Springsteen, who asserted the claim, and Masquerade Inc., a company incorporated and doing business in Great Britain.[3]

**2.** Section 1738 provides that the judicial proceedings of any state shall be given full faith and credit "in every court within the United States." The U.S. Supreme Court has held that "many courts" encompasses federal courts. *See Allen v. McCurry*, 449 U.S. 90, 96, 101 S.Ct. 411, 66 L.Ed.2d 308 (1980); *Davis v. Davis* 305 U.S. 32, 40, 59 S.Ct. 3, 83 L.Ed. 26 (1938).

**3.** A court may only exercise personal jurisdiction over a defendant in a state with which the defendant has "Certain minimum contacts ... such that maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" *Calder v. Jones*, 465 U.S. 783, 104 S.Ct. 1482, 79 L.Ed.2d 804 (1984), (*quoting Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316, 66 S.Ct. 154, 90 L.Ed. 95 (1945)).

If the cause of action related directly to the defendant's contacts with the forum state, it is one of "specific jurisdiction." Such jurisdiction depends on whether a defendant "purposely created contacts" with the forum state making it reasonable for him to anticipate being haled into court there. *See World–Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980); These contacts must have a basis in "some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum state, thus invoking the benefits and protections of its laws." *Hanson v.*

Therefore, the court has personal jurisdiction over the parties.

From the opinion of the court, it appears that both parties received adequate notice of the action, and that the British court carefully and thoroughly considered their respective allegations and proofs, provided Masquerade with ample opportunity to defend itself, and recorded the court's final decision clearly within that opinion. For instance, documents from the UK litigation indicate that Masquerade was developing its litigation strategies at least as early as August 1996, while the U.K. Judgment is dated December 10, 1998. *See* Certification of Edward S. Nathan, Ex. 22. The opinion of the High Court runs to 74 pages, and details extensive evidence presented to the court, as well as the court's thorough analysis of that evidence. Indeed, this court generally considers the courts of the United Kingdom fair and just tribunals. *See also Leo Feist*, 232 F.Supp. at 624. Finally, there do not appear to be, nor has either party to this action alleged, any special grounds on which the judgment should be impeached. As a result, this court will hold the UK judgment conclusive as to the issues tried upon the merits therein, to the extent that they satisfy the other requirements of the doctrine of collateral estoppel.

Under the doctrine of collateral estoppel, "once an issue is actually and necessarily determined by a court of competent jurisdiction, that determination is conclusive in subsequent suits based on a different cause of action involving a party to the prior litigation." *See Montana v. United States*, 440 U.S. 147, 153, 99 S.Ct. 970, 59 L.Ed.2d 210 (1979). So long as a party has been given a "full and fair opportunity to litigate" a matter, he or she is precluded from further litigation of the same matter. *Id.* This doctrine is invoked by the courts to promote conclusive resolution of disputes, thereby protecting parties from the expense of multiple lawsuits, conserving judicial resources, and increasing the reliability and consistency of judicial decisions. *Id.* at 973–974. As the Supreme Court has observed, there is no formula for proper estoppel decisions, and the ultimate decision is a matter of "the trial court's sense of justice and equity." *See Blonder-Tongue Laboratories, Inc. v. University of Illinois Foundation, et. al.*, 402 U.S. 313, 334, 91 S.Ct. 1434, 28 L.Ed.2d 788 (1971).

Of course, in order to apply the doctrine of collateral estoppel, the court must determine that the issue in the pending litigation is identical to the issue in the previous litigation. One way in which two issues may be distinct is if they present mixed questions of fact and law, and the legal standard under which the original court decided the issue applied a different legal standard than the standard applicable in the present litigation. *See* Wright, Miller & Cooper, *Federal Practice and Procedure: Jurisdiction* § 4417. Such differences in legal standards may be particularly easy to identify when foreign law was applied in the previous case; however, the standards under foreign law may

*Denckla*, 357 U.S. 235, 253, 78 S.Ct. 1228, 2 L.Ed.2d 1283 (1958); *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 476–76, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985). After the Court has established that defendants have the requisite minimum contacts with a forum, it must then determine whether it would be fair and just to require defendants to litigate in that forum. *Burger King*, 471 U.S. at 476–77,

105 S.Ct. 2174. This is particularly true when the Court seeks to exercise jurisdiction over foreign defendants, unlike in the U.K. litigation where the defendants were residents of the jurisdiction and the plaintiff was a foreign citizen. *Asahi Metal Indus. Co. v. Superior Court*, 480 U.S. 102, 114, 107 S.Ct. 1026, 94 L.Ed.2d 92 (1987).

be found to be the same as those applicable in the successive action. *Id.*

■ Generally, due process prohibits litigants who have never appeared in a prior action from being collaterally estopped, because those litigants have not had the opportunity to present their own arguments and evidence. *See Blonder,* 402 U.S. at 329, 91 S.Ct. 1434. The doctrine of collateral estoppel also applies, however, to parties who have not participated in the previous litigation but are found to be in privity with the parties estopped by the previous litigation. Parties are in privity when "there was a substantial identity of parties." *Chicago, Rock Island & Pac. Ry. v. Schendel,* 270 U.S. 611, 621, 46 S.Ct. 420, 70 L.Ed. 757 (1926). The party to the action and the privity must have interests so closely aligned that the party to the suit is the "virtual representative" of the non-party or the non-party controls the litigation. *See Collins v. E.I. DuPont de Nemours & Co.,* 34 F.3d 172, 176 (3d Cir.1994). Such virtual representation "should not be found to have occurred without 'an express or implied legal relationship' between the named party to the first action and the non-party sought to be bound." *Symbol Technologies, Inc. v. Metrologic Instruments, Inc.,* 771 F.Supp. 1390, 1400 (D.N.J.1991), citing *U.S. v. ITT Rayonier, Inc.,* 627 F.2d 996, 1003 (9th Cir.1980). The Third Circuit has construed the necessary legal relationship quite narrowly, to include only those instances in which a party to the suit is the legally designated representative of the non-party. *See Collins,* 34 F.3d at 176, citing Restatement (Second) of Judgments § 41 (1982).

In the instant case, it is clear that resolution of the nature of Cretecos's relationship with Appel and Springsteen, and the relationship of Sioux, Inc. to Sioux, Ltd. were necessary to the High Court's determination that Springsteen was the sole owner of the copyrights in question. It is also apparent that the High Court actually made findings regarding the nature of those relationships. This court must therefore resolve two issues: first, whether plaintiffs had a "full and fair opportunity" to participate in the UK litigation on the issues cited by Springsteen, or whether the plaintiffs were in privity with a party who had such an opportunity. Second, this court must determine whether the issues litigated in the High Court are identical to the issues before this court. This court will address plaintiffs' participation in the UK litigation first.

Springsteen does not contest plaintiffs' assertion that plaintiffs' licensee Masquerade refused to involve plaintiffs in the UK litigation. Springsteen points out, however, that the plaintiffs participated in the litigation directly, by sending the court two letters detailing plaintiffs' positions on the copyright issues at stake in the UK litigation. Springsteen also contends that he should not be penalized for Masquerade's refusal to involve plaintiffs in the UK litigation. Instead, he argues that plaintiffs should seek relief from Masquerade for breach of contract.

■ The court finds that plaintiffs were not in privity with Masquerade in the UK litigation, because while plaintiffs and Masquerade had an overlapping interest in the validity of plaintiffs' copyrights, Masquerade did not have the authority under its licensing agreement with plaintiffs to act as the plaintiff's legal representative, but could only participate in litigation regarding the "Bruce Springsteen project" in conjunction with the plaintiffs. Since Masquerade refused to allow plaintiffs to participate in the UK litigation, it did not act as the legal representative of plaintiffs in that action. Therefore, the plaintiffs did not stand in privity with Masquerade in

the UK litigation. *See Collins*, 34 F.3d at 176.

This court also finds that plaintiffs' participation in the UK litigation did not rise to the level of actual full and fair participation. The letters submitted by the plaintiffs assert arguments which plaintiffs did not bolster via witnesses or cross examination of Springsteen's witnesses. Nor did plaintiffs participate in the litigation strategy of the party before the court. Such a finding does not, however, resolve the question of whether plaintiffs had the *opportunity* to participate, but forewent that opportunity.

■ As Springsteen points out, the license which plaintiffs granted to Masquerade, the party to the UK litigation, provides that plaintiffs should have the opportunity to participate in such proceedings:

> Masquerade shall be responsible to engage competent legal counsel to prosecute, defend or intervene in any court proceedings now pending or hereinafter brought by or against Masquerade, Pony Express, JEC Music or any of their respective principals regarding the Bruce Springsteen Project. Such counsel shall be engaged with the consent of Pony Express and JEC Music and such counsel shall be professionally responsible to Pony Express and JEC Music .... All legal strategies shall be developed jointly and with our participation and the participation of our counsel in the United States.

*See* Nathan Cert., Ex. 21, para. 7. Therefore, the only barrier to plaintiffs' participation was Masquerade's refusal to permit their participation. Plaintiffs have not demonstrated, however, that Masquerade's refusal left them without recourse. Plaintiffs did not attempt to enforce Masquerade's contractual obligation to permit plaintiff's participation, but instead simply terminated Masquerade's license. Termination did not end Masquerade's legal obligation to allow plaintiffs to participate in the litigation, as that litigation was initiated when the license was valid and addressed the subject of the license, the Bruce Springsteen Project. Since plaintiffs made no effort to enforce their legal right to participate in the litigation, this court cannot conclude that plaintiffs were denied the opportunity to exercise that right. The burden placed upon them in the exercise of that right by Masquerade may create a claim against Masquerade; however, the burden should not be transferred to Springsteen, who was not a party to the alleged breach of the licensing agreement. Permitting the plaintiffs to proceed with the instant litigation would enable them to proceed strategically in both jurisdictions and chose the result most favorable to them.

As a result, the plaintiffs are estopped from re-litigating issues that were already decided in the UK judgment. This court must therefore determine which issues decided in the UK litigation are identical to issues presently before this court. Springsteen asserts that four of the UK court's findings have preclusive effect in this action: first, the UK court found that Cretecos did not have individual dealings with Springsteen, but only dealt with Springsteen in Cretecos's capacity as Appel's partner; second, that Sioux. Inc. was owned jointly by Cretecos and Appel; third, that the copyrights in Springsteen's compositions were transferred to Sioux, Inc. pursuant to the May 1972 Songwriters Agreement; and fourth, that Sioux, Inc. was incorporated as Sioux, Ltd. .

■ The first, second and third findings of the High Court are clearly factual, and are therefore most easily found to be identical to issues before this court. The High Court did not apply a legal standard

to make those findings, but instead, weighed the credibility of various witnesses, interpreted documents supplied as evidence to the court, and drew conclusions about the likely behavior of the parties in light of their respective interests in Springsteen's songs. *See* Nathan Certification, Ex. 23, pp. 32–39. In making the fourth determination, whether Sioux, Inc. was incorporated as Sioux, Ltd., thereby transferring the copyrights of Sioux, Inc. to Sioux, Ltd., the High Court considered the evidence under the requirement of the British Copyright Act of 1956, Section 36(3), which required that a copyright be assigned by a writing, signed by the assignor. According to Springsteen, in 1972 U.S. law did not require evidence of such a writing to establish transfer of a copyright. *See Magnuson v. Video Yesteryear*, 85 F.3d 1424, 1428–29 (9th Cir.1996) (finding transfer of common law copyright based on parties' conduct under pre–1976 copyright law). Therefore, U.S. courts would apply a different legal standard to the question of whether the copyrighted material had been transferred. The existence of a different legal standard suggests that the issue decided in the UK litigation may not be the same as the issue before this court.

The British standard is stricter, however, than the standard this court would apply, and the High Court nevertheless found that such a transfer of copyrighted materials took place in 1972. Courts have denied preclusion on the grounds that the court presently deciding the case would apply a stricter standard of review than the court that had previously decided the case. *See, e.g., Bailey v. Andrews*, 811 F.2d 366, 369–70 (7th Cir.1987) (finding that a determination that there was sufficient evidence to establish probable cause to prosecute the defendant was not the same issue as that presented in action against the same officer for making the same arrest, but without probable cause). Since the reverse is true in this case, however, the issue before this court is not necessarily different than the issue adjudicated before the High Court. The High Court made factual findings sufficient to demonstrate both the existence of the copyright transfer under its law and the existence of the transfer under the U.S. law in place in 1972. Without accepting the High Court's legal determinations, this court may incorporate the High Court's evaluation of the credibility of the witnesses testifying to the incorporation of Sioux, Ltd. and reconstruction of the likely chain of events in the incorporation of Sioux, Ltd.. Accepting the High Court's factual determination that the copyrights at issue were transferred from Sioux, Inc. to Sioux, Ltd. precludes this court from deciding that issue in favor of the plaintiffs.

■■ As a result of this court's determination that the plaintiffs are estopped from litigating the nature of the relationship of Cretecos and Appel, and the relationship of Sioux, Ltd. and Sioux, Inc.. no disputed issues of material fact remain as to Springsteen's ownership of the copyright. Therefore, Springsteen's motion for summary judgment as to Plaintiffs' claims is granted and the court must address Springsteen's counterclaims for copyright infringement.

### *Summary Judgment as to Springsteen's Counterclaims*

Springsteen contends that since no material issue of fact exists as to his ownership of the copyright, he should be granted summary judgement with respect to liability on his counterclaims, he should be awarded his costs and attorneys' fees as the prevailing party pursuant to § 505 of the Copyright Act, 17 U.S.C. § 505, and a

hearing should be scheduled to determine the amount of damages he is entitled to recover under § 504 of the Copyright Act.

■■■ Having established that he is the owner of the copyrights in question[4] and that Cretecos maintains no ownership interest in any of Springsteen's unrecorded works, and it being undisputed that counterclaim defendants manufactured, reproduced, distributed, sold and licensed Springsteen's compositions and sound recordings, Springsteen has demonstrated that there is no disputed material issue of fact as to liability with respect to his infringement counterclaim, and that he is entitled to relief as a matter of law. Springsteen has not, however, articulated the legal standard by which this court should adjudicate his remaining counterclaims and has not described the elements of those counterclaims and the extent to which the proofs offered this court have satisfied Springsteen's burden as to the existence of those elements.

This court therefore finds liability as to Springsteen's first counterclaim, grants permanent injunctive relief pursuant to 17 U.S.C. § 502 and grants Springsteen's request for disposition of the offending articles pursuant to 17 U.S.C. § 503. The court will reserve for subsequent proceedings the issues of damages, costs and attorney's fees stemming from infringement. The court denies without prejudice summary judgment and remedies as requested in Springsteen's second, third, fourth and fifth counterclaims, pending further submissions on the part of Springsteen stating the elements of those claims and describing how the undisputed material facts of this case establish those elements and entitle Springsteen to the requested relief.

## ORDER

This matter having come before the court on motion of defendant/counterclaimant, Bruce Springsteen ("defendant" or "Springsteen") for summary judgment dismissing with prejudice all claims of plaintiffs/counterclaim defendants Pony Express Records, Inc. ("Pony Express") and JEC Music USA, Inc. ("JEC Music") (collectively "plaintiffs" or "counterclaim defendants") and for summary judgment with respect to the issue of liability on each of Springsteen's counterclaims and the award of statutory damages, costs and attorney's fees, and this court having considered the arguments of counsel for Springsteen and for Pony Express and JEC Music, and for the reasons set forth in an opinion issued this same day:

IT IS on this 22nd day of June, 2001.

ORDERED that Springsteen's motion for summary judgment dismissing with prejudice all claims of plaintiffs is GRANTED; and IT IS

ORDERED that Springsteen's motion for summary judgment with respect to the issue of liability as to his first counterclaim for federal copyright infringement is GRANTED; and IT IS

ORDERED that Springsteen's motion for summary judgment with respect to liability as to Springsteen's second coun-

---

**4.** Springsteen asserts that he is the sole lawful owner of all right, title and interest in and to the copyrights in the following compositions and sound recordings (collectively, the "compositions and sound recordings"): Seaside Bar Song; War Nurse; Evacuations of the West; Eloise; Lady and the Doctor; Arabian night; Visitation at Fort Horn; Jazz Musician; Jesse; Prodigal Son; Family Song; Randolph Street; Camilla Horn; Hey Santa Anna; Marie; Song to the Orphans; Southern Sun; Border Guard; Hollywood Kids; If I Was the Priest; Cowboys of the Sea; Baby Doll; Two Hearts in True Waltz Time; Tokyo; Zero and Blind Terry Version I; and Bishop Danced. *See* Amended Counterclaim and Demand for Jury Trial, para. 23.

478

terclaim for declaratory judgment under 28 U.S.C. § 2201, his third counterclaim for violation of Section 43(a) of the Lanham Act; his fourth counterclaim for Common Law Unfair Competition and his fifth counterclaim for Common Law Invasion of Privacy and Misappropriation of Name and Likeness are DENIED, pending further submissions described in the opinion issued this same day, made within 30 days of the issuance of this order; and IT IS

ORDERED that counterclaim defendants and their officers, directors, agents, servants, employees, attorneys, successors and assigns, and all persons in active concern and/or participation with them, and each of them, be preliminarily and permanently enjoined and restrained from manufacturing, distributing, selling, copying, printing, publishing, exhibiting, transmitting, vending, licensing, or otherwise distributing or disposing of copies of phonorecords containing and/or embodying Springsteen's Compositions and Sound Recordings[1]; and IT IS;

ORDERED that counterclaim defendants deliver up for destruction or other reasonable disposition all copies of phonorecords found to have been made or used in violation of Springsteen's rights, as well as all plates, molds, matrices, masters, tapes and/or articles by means of which such copies have been or may be produced; and IT IS

ORDERED that counterclaim defendants file with the Court and serve upon Springsteen within thirty (30) days after service upon counterclaim defendants of this Court's final judgment in this action, a written report, under oath, setting forth in detail the manner and form in which counterclaim defendants have complied with such injunction; and IT IS

ORDERED that Springsteen's motion for award of statutory damages, costs and attorney's fees is reserved for trial.

---

1. The "compositions and sound recordings" refer to: Seaside Bar Song; War Nurse; Evacuations of the West; Eloise; Lady and the Doctor; Arabian night; Visitation at Fort Horn; Jazz Musician; Jesse; Prodigal Son; Family Song; Randolph Street; Camilla Horn; Hey Santa Anna; Marie; Song to the Orphans; Southern Sun; Border Guard; Hollywood Kids; If I Was the Priest; Cowboys of the Sea; Baby Doll; Two Hearts in True Waltz Time; Tokyo; Zero and Blind Terry Version I; and Bishop Danced.